UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 3:17-cr-0016-GFVT |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| RONNIE C. RODGERS, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

The Government has requested restitution for well over a hundred victims of Defendant

Ronnie C. Rodgers's conspiracy to commit securities fraud. These requests include varying

degrees of evidentiary support for the loss amounts. While the Court need not determine

restitution by finding facts beyond a reasonable doubt, the Court must determine a loss amount

by a preponderance of the evidence. Because some of these requests are supported by sufficient

evidence while others are not, the Court **GRANTS IN PART** and **DENIES IN PART** the

Government's Motion for Restitution. Mr. Rodgers is ordered to pay restitution in the combined

amount of **$2,180.562.17**, as further outlined below.

**I**

**A**

Mr. Ronnie Rodgers was charged on December 7, 2017 with one count conspiracy to

commit mail fraud, wire fraud, and securities fraud in violation of 18 U.S.C. §§ 1341 and 1343,

15 U.S.C. § 78j(b), and 17 C.F.R. § 240-10b-5. [R. 1.] According to the indictment, from 2007

through 2017, Mr. Rodgers and his associates executed a scheme to sell oil and gas leases in

geographical areas where Mr. Rodgers knew the leases would not produce enough oil or gas to provide a return of the investments. *See id*.

The jury returned a guilty verdict for conspiracy to commit mail fraud, wire fraud, and securities fraud. [R. 64.] To convict Mr. Rodgers with mail or wire fraud, the jury was required to find the development of or participation in a scheme to defraud, that he used the mails or an interstate wire communication in furtherance of the scheme, and that he possessed "intent to deprive a victim of money or property." *United States v. Ramer*, 883 F.3d 659, 681 (6th Cir. 2018) (enumerating the elements of mail fraud); *United States v. Olive*, 804 F.3d 747, 753 (6th Cir. 2015) (enumerating the elements of wire fraud and noting, "Mail fraud has essentially the same elements [as wire fraud] except that the use of the mails rather than a wire is required."). For the jury to convict Mr. Rodgers of securities fraud, the jury had to find that he used or employed a manipulative or deceptive device in contravention of 17 C.F.R. § 240-10b-5 in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). Accordingly, the jury had to determine that Mr. Rodgers (1) employed a device, scheme, or artifice to defraud, (2) made any untrue statement or omission of a material fact, or (3) engaged in an act, practice, or course of business, operating as a fraud or deceit. 17 C.F.R. § 240-10b-5. However, Mr. Rodgers was charged with *conspiracy* to one of these things, and thus, the jury only need to find that Mr. Rodgers joined in an agreement to commit mail, wire, or securities fraud, and that at least one person in the conspiracy committed an overt act in support of the conspiracy. *United States v. Phillips*, 872 F.3d 803, 806 (6th Cir. 2017).

This Court sentenced Mr. Rodgers on January 9, 2019, to forty-eight months imprisonment, followed by three years of supervised release. [R. 88; R. 90.] Restitution was

ordered, but a specific calculation of restitution was deferred pending briefing by both parties.[1]
*Id*. The United States filed a motion for an award of restitution in the total amount of
$6,874,766.01, on January 25, 2019, which included only a spreadsheet of the victims' alleged
loss amounts and lacked any evidence to support those requests. [R. 97.] Mr. Rodgers made
objections to a general award of restitution but made no specific objections to requests by each
victim. [R. 101.] At a hearing held on February 20, 2019, the Court determined more evidence
was needed to award restitution and directed further briefing. [R. 103; R. 104.] The United
States has filed their supplementation under seal [R. 116], and Mr. Rodgers has made his
objections [R. 119.]

**B**

Restitution in this case is mandatory. The Mandatory Victims Restitution Act (MVRA)
requires Courts to order restitution when sentencing defendants convicted of certain offenses. 18
U.S.C. § 3663A(a)(1). Included in these offenses are crimes against property, including crimes
involving fraud and deceit. § 3663A(c)(1)(A)(ii). When a defendant is convicted of a
conspiracy, a Court may calculate restitution using "damage resulting from any conduct that was
part of the conspiracy and not just from specific conduct that met the overt act requirement of the
conspiracy conviction." *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016) (citations
and quotations omitted). Furthermore, if more than one defendant contributed to a victim's
losses, the Court is permitted to make each defendant liable for the full amount or restitution or

---

[1] Under 18 U.S.C. §3664(d)(5), the Court must determine restitution within ninety days of sentencing the
defendant. Mr. Rodgers's sentencing was held on January 9, 2019, and that ninety-day window has now
passed. However, when a sentencing court misses the deadline, it does not forfeit power to order
restitution if, prior to the deadline, the court made clear it would order restitution, but failed to specify an
amount within ninety days. *Dolan v. United States*, 560 U.S. 605, 607–08 (2010). The Court stated at
sentencing that restitution would be ordered pursuant to the Mandatory Victims Restitution Act but
briefing on the specific amount of restitution was not completed until April 26, 2019. [R. 119.] Thus,
under *Dolan*, the Court retains authority to set restitution for Mr. Rodgers.

may choose to apportion restitution accordingly. 18 U.S.C. § 3664(h). The Government bears the burden of proof to demonstrate the amount of loss sustained by a victim, and disputes must be resolved by the Court under a preponderance of the evidence standard. § 3664(e). In this specific matter, it is also important to note that restitution is calculated based on the full amount of a victim's losses, not Mr. Rodgers's gain. § 3664(f)(1)(A).

A victim's losses must only be demonstrated by a preponderance of the evidence. §3664(e). The "preponderance of the evidence" standard requires a trier of fact, in this case, the Court, to find "the existence of a fact is more probable than its nonexistence." *Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371–72 (1970)). Because the burden here rests on the Government, the Government must persuade the Court of the existence of their proposed facts. *Id.*

To do so initially, the Government provided spreadsheet exhibits, summarizing victims' claims for restitution, but without providing the evidence upon which the spreadsheets were constructed. [R. 97.] Additional submissions prior to the February 20, 2019, hearing included sworn affidavits submitted to the United States Probation Office (USPO). Some, but not all, of these affidavits included itemized lists of expenses or photocopies of checks written to Mr. Rodgers's companies. Some victims submitted only letters to the USPO or to the Government directly without sworn affidavits. The varying degree of reliability of this evidence gives the Court pause, and so, before reviewing the supplementary evidence and objections provided by the parties, the Court first establishes a framework by which to weigh each victims' request for restitution.

Evidence "underlying an award must have sufficient indicia of reliability to support its probable accuracy." *United States v. Sawyer*, 825 F.3d 287, 294–95 (6th Cir. 2016) (citations and quotations omitted). The Court must make adequate factual findings when the calculated loss amount is disputed. *United States v. Sexton*, 894 F.3d 787, 801 (6th Cir. 2018). But the Circuit Courts generally leave evidentiary determinations, and which evidence provides an indicium of reliability, up to the District Courts, so long as the District Court explains its reasons.

If Mr. Rodgers had been indicted on specific counts of fraud, the jury would have had the opportunity to consider each victim's allegations and either accept or deny the evidence behind those allegations beyond a reasonable doubt. However, this does not mean that Mr. Rodgers cannot be held responsible for those losses. In *Apprendi v. New Jersey*, the Supreme Court found, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). However, because restitution statutes do not specify a statutory maximum amount, the Sixth Circuit has held that restitution claims need not be submitted to a jury. *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005). In this matter, restitution requests must demonstrate by a preponderance of the evidence, that the victim's losses result from conduct in furtherance of the convicted conspiracy, not just conduct from the over acts required for a conspiracy conviction. *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016).

The Court first finds that a summary spreadsheet, without additional evidence, is insufficient to meet the preponderance of the evidence standard. In the Sixth Circuit, "a summary chart, when supported by additional evidence, can be used by the government to establish losses for the purposes of restitution." *United States v. Carmichael*, 676 F. App'x 402, 412 (6th Cir. 1017) (citing *United States v. Sawyer*, 825 F.3d 287, 296 (6th Cir. 2016). In

*Carmichael*, the Sixth Circuit found the trial court did not abuse its discretion when considering the summary chart along with additional, supporting evidence. *Id*. at 413. The trial court also reviewed testimony on how the chart was prepared, the investigatory efforts in collecting the data, the ledger, and the victim-impact statements. *Id*. Other circuits agree. *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (holding that the district court erred by basing an award of restitution on one-page summaries without requiring detailed explanations of the losses suffered); *United States v. Hartstien*, 500 F.3d 790, 796 (8th Cir. 2007) ("Summary tables of accounting data that are based on evidence not before the court, and that a party has challenged as inaccurate, are not sufficient to support a court's factual findings."); *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998) ("the government must provide the district court with more than just the general invoices . . .. The government must provide sufficient explanations (supported by evidence reflected in the record) as to how these invoiced losses directly relate to [the defendant's] criminal conduct involved in his underlying convictions."). Therefore, summary requests, such as those included in a spreadsheet, without detailed explanations of specific losses, are insufficient to award restitution.

But what rises to the level of such detailed explanation? Undoubtedly, each request will require individual determinations of reliability, particularly when a defendant can provide evidence contrary to a victim's statement. Even without objections by a defendant, however, the victim's request must still include "sufficient indicia of reliability." *United States v. Sawyer*, 825 F.3d 287, 294–95 (6th Cir. 2016). Because the Sixth Circuit generally upholds a district court's restitution award so long as it is within "the universe of acceptable computations," and because the Court "has wide latitude to determine the amount of a victim's losses," the Court takes this opportunity to outline what uncontested evidence would include such reliability sufficient to

support an award of restitution. *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016); *United States v. Patel*, 711 F. App'x 283, 287 (6th Cir. 2017).

First, a victim's testimony at trial could support an award of restitution. Trial testimony occurs under penalty of perjury, and opposing counsel has the opportunity to cross examine the witness. The combination of direct questioning by the Government and cross examination by the defendant would give the Court sufficient information to determine whether or not a victim's statements are reliable. Evidence admitted at trial to accompany a victim's testimony is similarly subject to scrutiny by the defendant because this too gives the opportunity for a defendant to object to consideration of that evidence.

The more difficult question arises when a victim did not testify, was not subject to cross examination, but has submitted a statement to the Government, the USPO, or the Court requesting a specific award of restitution. While those statements may be sworn affidavits, the Court determines that statements by a victim, without additional documentation of loss amount, do not include sufficient indicia of reliability. *See, e.g., United States v. Steele*, 897 F.3d 606, 613 (4th Cir. 2018) (finding a victim's unsupported loss estimate, without additional evidence, insufficient to satisfy the Government's burden of proof); *United States v. Charles*, 895 F.3d 560, 566 (8th Cir. 2018) (finding mere statements, without other documentation, do not support a Government's claim by a preponderance of the evidence); *United States v. Baker*, 584 F. App'x 469, 471–72 (9th Cir. 2014) (finding the district court properly discredited evidence which did not clearly specify victim's losses or clearly specify how such losses were caused by the defendant's criminal conduct); *United States v. Simmons*, 544 F. App'x 21, 24 (2d Cir. 2013) (finding the court abused its discretion by awarding restitution based on nothing more than an unsworn letter by a victim when the Government provided "almost no information about the loss

amount, no documentation regarding [the victim's] loss, and no explanation as to why procuring

details or documentation was impracticable"). *But see United States v. Dial*, 705 F. App'x 250,

255–56 (5th Cir. 2017) (finding the district court was permitted to rely solely on victim impact

statements unless the defendant presented rebuttal evidence); *United States v. Lopez*, 503 F.

App'x 147, 150 (3d Cir. 2012) (upholding an award of restitution based only on a Government-

prepared spreadsheet of losses and a sworn statement by the victim).

     While a conclusory statement by a victim suggests a loss, such statement does not

provide sufficient evidence to determine the amount of loss or whether such loss was

proximately caused by the victim. Bank records, copies of checks, invoices, deposit slips, etc. all

demonstrate a presumably reliable record of financial loss to which a defendant may make

specific objections. If the Government submits only a victim's statement of a total loss amount,

a defendant would be forced to locate those same records in order to rebut the Government's

request. But determination of restitution is not a burden shifting framework and requiring this of

the defendant improperly shifts the burden from the Government to demonstrate loss amount to

the defendant to disprove loss amount. A detailed sworn statement, however, outlining the total

loss amount and how that loss amount was calculated, may be sufficient if the calculation is

consistent with the testimony offered at trial.

     Accordingly, the Court finds that mere conclusory statements, whether sworn or

unsworn, are also insufficient to establish reliability sufficient to support an award of restitution.

For this Court to find the required indicia of reliability, the Government must provide evidence

other than a victim's stated loss amount to establish loss and the amount of that loss. In this

case, copies of checks written to Mr. Rodgers and/or his affiliated companies, bank records

showing transfers of money, invoices by Mr. Rodgers and/or his affiliated companies, and other

related documents would indicate reliability to the Court.  Furthermore, the Court will consider detailed affidavits that include calculations of loss consistent with testimony offered at trial to be reliable.  The Court further notes that this list is not exclusive.

## II

Having outlined this framework, the Court now considers the restitution requests by the Government and the objections made by Mr. Rodgers.  The Government has submitted a spreadsheet outlining their requests, plus a disk with a large number of documents to support these requests, but no specific argument as to how they calculate their requests.  [R. 116.] Because of this, the Court has not placed much emphasis on the exact dollar amount requested by the United States, instead reviewing the trial testimony, trial exhibits, and documents submitted on that disk to determine the award amount for restitution.  Relatedly, Mr. Rodgers has not made specific objections to the amounts requested or identified payments that should not be counted for the purposes of restitution.  Instead, he has continued to make general objections to the awards of restitutions, stating that these victims "did not provide any evidence that Ronnie Rodgers was the direct cause of the alleged loss."  [*See* R. 119.]

## A

To begin, the United States has made numerous requests based on checks obtained from the Department of Financial Institutions, but which do not include a statement, sworn or unsworn, from the victim.  [*See* R. 116.]  These requests are insufficient to determine an amount of loss for restitution purposes: while the Court can clearly see that the alleged victim paid Mr. Rodgers and/or Rick-Rod Oil, the Court is unable to determine if this is the actual amount of loss.  Testimony at trial suggested that many investors received at least some amount in royalties or other returns, though that amount varied wildly among investors.  [*See, e.g.*, R. 107 at 170,

221; R. 108 at 12, 31, 45, 59, 61, 93–94, 119, 127, 131, 182; R. 109 at 35–36, 118–119; R. 112 at 67.] Thus, absent any evidence that these victims received any of this money back, the Court is unable to even guess the amount of loss by these victims, much less determine by a preponderance of evidence. For these victims, the United States has failed to meet its burden. 18 U.S.C. § 3664(e).

Having determined this, absent additional documentation, the restitution requests on behalf of Louis and Judith Arruda, Ibrahim and Dima Ayoub, B&K's Lawn Care Inc., Greg Barber, Jim Bedell, Ronnie Belk, Paul Brooks, Junior Brown, Ed Bascum Grider, Kimberly Cacciaguida, Keooudom Chianthong, Cuppy's Coffee, Bobby Green and Barbara Curry, Michael Darby, Sal and Elena DeRosa, Marvin Ezray, Global Moulding Inc., Gold Run Trading LLC, Mike Gould, Dennis Griffin, Lance Harrison, Mike and Wanda Hatcher, Dianne Heleno, Suzanne Heleno, Murray Helmers, Larry Henderson, David Hughes, Johnny and Carole Ireland, John Jarvis,[2] Norman and Vicki Kent, Kevin Kessler, Richard Kittay, Marketing Comm Inc.,[3] Edward and Mary McCaffrey, Rex McCarter, Edward Mendel, Nancy Mendel,[4] Michael Minchino,[5] Joan and William Naylor, Tom and Angela Newslow, Tony Norris, Kevin O'Connor, Ralph Pantony, Richard and Carol Quint, Ramsey Investment Group, Roger and Melissa Richard, Michael and Robin Richardson, Bobby Simmons, Sammy and Margaret

---

[2] Mr. Jarvis submitted more than just the copies of his checks: he also submitted the complaint he filed with the Kentucky Department of Financial Institutions and a copy of his $25,000 check. [R. 116-2.] While his attached letter implies that he lost money, no specific amount of loss has been alleged.

[3] The records provided for Marketing Comm, Inc., actually relate to another victim, William Moore. [R. 116-2.] Additionally, the folder for William Moore included a check written by Marketing Comm, Inc., for an investment. *Id.* However, no other records regarding Marketing Comm were provided.

[4] The Government also provided a memorandum of an interview with Ms. Mendel and copies of contracts as well as checks. [R. 116-2.] However, none of the provided materials referenced actual losses or returns Ms. Mendel may have received.

[5] The Government also provided an unsigned and unsworn letter from Mr. Minchino, however, that letter made only a reference to $25,000 without specifying how much he invested or indicating whether or not he received any return on that investment. [R. 116-2.]

Taylor, Texas Holsteins Inc., Timberwood Development Corp., Robert and Mildred Vaughn, Condy and Betty Young, Connie and Mark Young, Troy Young, and Richard Zimmerman are **DENIED.**

**B**

The Government has also made restitution requests for various victims who testified at trial. [*See* R. 116.] As stated previously, this testimony occurred under penalty of perjury, with opportunity for opposing counsel to cross examine the victim. Because of this, this trial testimony gives the Court sufficient information to determine the amount of restitution owed by a preponderance of the evidence.

Pamela Freeman testified at trial that she and her late husband, Keith, invested in Mr. Rodgers's company. [R. 69 at 5.] She stated at trial that she and her husband invested a total of $60,000, and two contracts showing two investments of $30,000 each were also introduced. *Id.* at 13–19. The United States has requested $70,000 in restitution to Ms. Freeman, however, the testimony and evidence provided support that she only invested $60,000. [*Compare* R. 116-1 at 1 *with* R. 69 at 13–19.] Additionally, at trial, Ms. Freeman indicated that they "received a $400 check from Mr. Rodgers on one of our visits . . . and he gave us a good faith check for $400." [R. 69 at 18.] Thus, the Court finds that Ms. Freeman's loss is $59,200: the $60,000 of her investment less the two checks she received from Mr. Rodgers.

Avner Elizarov submitted an affidavit to the United States Probation Office requesting restitution of $620,000.[6] The Government has asked for $330,000. [R. 116-1 at 1.] Mr. Elizarov lists his losses as $330,000 for two leases, $38,000 in fees paid to Mr. Rodgers and associates for improvement on the leases, $4,200 to close two wells because of environmental

---

[6] Mr. Elizarov requests $620,000. However, by the Court's calculation, $330,000 + $19,800 + 38,000 + $4,200 + $2,000 + $216,000 = $610,000, not $620,000.

issues, $2,000 in travel fees, $19,800 for interest return promised by Mr. Rodgers, and $216,000 in lost opportunities and emotional stress. Restitution can only be awarded for *actual* losses, not lost opportunities, and therefore the requests for $237,800 in travel, lost interest, lost opportunity, and emotional distress are not permitted here. At trial, Mr. Elizarov testified that he invested $330,000 up front: $130,000 to purchase a property and $200,000 to lease a well. [R. 70 at 23–27.] He also indicated he still owned the property. *Id*. at 24. True, Mr. Elizarov likely purchased the property at a higher rate in anticipation of oil, however, no one has offered any information on the value of the property and how much more Mr. Elizarov paid over that actual value. Because Mr. Elizarov still owns the property, the entire $130,000 cannot be considered a loss. The Court has insufficient information as to its value; thus, the Court does not have enough evidence to calculate how much Mr. Elizarov lost on the property and disallows restitution relating to its purchase. He further testified at trial to paying $1,554 in fees, but also indicated he "lost more money" than that, but he never elaborated on exactly how much more. Because he sufficiently outlined these expenses in his sworn statement, however, the Court will permit the full $38,000 in fees, plus the $4,200 to close the wells. This amount, plus the $200,000 paid for the oil lease brings the total amount of investment for purposes of restitution to $242,200. Finally, at trial, Mr. Elizarov also testified that he received up to $7,000 in royalties [R. 70 at 4–5], bringing his total loss to $235,200.

The request from Andrew Linley is less complicated. The United States requests $650,000. He testified at trial that he invested $650,000 with Mr. Rodgers, but he received nothing in return. [R. 72 at 4–5.] Since this amount was subject to cross-examination, and the Government at trial introduced the $650,000 wire transfer from Mr. Linley to the escrow account [Gov. Exh. 28B], the Court calculates Mr. Linley's loss to be $650,000.

Similarly, Herb Steffen testified that he and his wife, Georgia, invested $30,000 with Mr. Rodgers [R. 73 at 4] but received nothing in return [R. 73 at 11–12]. The Government introduced as evidence the contract signed by Mr. Steffen, Ms. Steffen, and Mr. Rodgers outlining that investment. [Gov. Exh. 26A.] Therefore, the Court calculates the loss of Herb and Georgia Steffen to be $30,000.

Eldridge Montgomery also testified that he invested with Mr. Rodgers. Specifically, the Government produced a check from Mr. Montgomery for $25,000 [Gov. Exh. 2C] and for $3,300 [Gov. Exh. 2G] for a total investment of $28,300 [R. 107 at 110]. Additionally, he testified that he never received anything from his investment. [R. 107 at 118, 128–29.] The Court finds his loss to be $28,300.

Next, Lillian Tharpe testified that she invested "about $143,000." [R. 107 at 147–48.] Exhibits supported several payments totaling $117,250 (though the Government's restitution request rounds this to $120,000). *Id*. at 147–62. Ms. Tharpe also testified that she received around $15,000, though she does not know the exact amount of her return on investment. *Id*. at 158. Because Ms. Tharpe was unsure of exact amounts, the Court finds that the exhibits introduced support that she invested a total of $117,250, and that she received up to $15,000 back, making her total loss for the purposes of restitution to be $102,250.

Jory Drager invested $30,000 to Rick-Rod Oil. [R. 107 at 183–84.] He paid that initial investment with a single check. [Gov. Exh. 15D.] Unfortunately, he has "never gotten a single penny back" from this investment. [R. 107 at 190.] Thus, Mr. Drager lost $30,000 for the purposes of restitution.

Another victim, Candys Hemphill Adams, testified that she invested a total of $89,500. [R. 107 at 221.] The Government also introduced several checks from Ms. Adams along with

bills from Mr. Rodgers that Ms. Adams confirmed she had paid. *Id.* at 214–21. Ms. Adams claimed that she received "less than $5,000" as a return for her investment. *Id.* at 221. Subtracting this $5,000 in returns from her total investment of $89,500, the Court finds Ms. Adams lost $84,500 for the purposes of restitution.

Dale Beeghly testified that he gave Mr. Rodgers and his companies $28,500. [R. 108 at 35.] The United States introduced exhibits of checks from Mr. Beeghly for the amounts of $25,000 [Gov. Exh. 6A] and $3,300 [Gov. Exh. 6B]. He indicated receiving five checks from Mr. Rodgers in the amounts of $2,500, $3,500, $1,200, $1,500, and $450 [R. 108 at 54; Gov. Exh. 6J] plus another check for $70 [R. 108 at 44] and a MoneyGram from Rickey Rodgers for $500 [Gov. Exh. 6K] for a total of $9,720 as a return on his investment. By the Court's calculations, this means Mr. Beeghly lost a total of $18,780 for the purposes of restitution.

Patrick Schneider invested $74,500. [R. 108 at 88, 94.] Of that investment, he received $10,000 in royalty checks for the oil. *Id.* He testified to these amounts multiple times at trial. Subtracting the $10,000 he received from his total investment of $74,500, Mr. Schneider's loss for the purposes of restitution is $64,500.

Talbert "Hal" Campbell testified that he invested $100,000, and the Government introduced as a trial exhibit his check to Rick-Rod Oil, Inc. for that $100,000. [R. 108 at 118; Gov. Exh. 5E.] He also estimated that he received checks totaling approximately $1,000. [R. 108 at 119.] The Government provided to the Court royalty checks from Barrett Oil and Sunoco in the amounts of $379.10, $189.05, $318.96, and $141.72, for a total of $1,028.83. [*See* R. 116-2.] The $1,028.83 subtracted from Mr. Campbell's total investment of $100,000 leaves him with a loss amount of $98,971.17.

Stephen Chimnes provided the check for $30,000 he invested with Mr. Rodgers. [R. 108 at 157; Gov. Exh. 5H.] He testified that he received "small checks here and there" for royalties, but that the checks totaled under $1,000. [R. 108 at 159–60.] The Government provided copies of royalty checks for $97.68 (USA-00026924), $45.53 (USA-00026927), $54.64 (USA-00026937), $54.90 (USA-00026939), $113.75 (USA-00026942), $96.17 (USA-00026949), which total $462.67 and are consistent with Mr. Chinnes's testimony of small checks under $1,000. [R. 116-2.] Thus, the Court subtracts the $462.67 in royalties from the total investment of $30,000 for a total loss of $29,537.33.

Roy Lowery also testified at trial that he invested $100,000 in Mr. Rodgers's scheme. [R. 108 at 172.] He also indicated that he received between $2,000 and $3,000 as a return on his investment. *Id*. at 183. His signed affidavit provided to the Government elaborates that he invested $80,000 in two separate contracts, plus he paid five rounds of completion fees at $3,500 each. [R. 116-2.] Less the up to $3,000 he received on this investment, the Court finds by a preponderance of evidence that Mr. Lowery lost $97,000 on this venture.

Charles Zimmerman invested $35,000. [R. 109 at 13, 23.] At trial, he also repeatedly relayed that he received nothing from his investment, not even royalty checks. *Id*. at 13, 18. Thus, for the purposes of restitution, Mr. Zimmerman sustained a loss of $35,000.

Randall Powell initially invested $25,000 [Gov. Exh. 10A] and then paid a $3,500 completion fee, for a total of $28,500. [R. 109 at 29–32.] He testified that he received no money from the oil but conceded that he received $8,700 from Rickey Rodgers "to make things right." *Id*. at 34–36. Subtracting this $8,700 from the total investment of $28,500 results in a loss of $19,800 for Mr. Powell.

Next, Jack Hill testified that he invested somewhere around $15,000. [R. 109 at 48.] The Government introduced a check for Mr. Hill's initial investment of $12,500 [R. 109 at 55; Gov. Exh. 19D], plus a $1,650 check for roughly half the completion fee [R. 109 at 57; Gov. Exh. 19F], and a $1,666 check for the remaining fee due [R. 109 at 58; Gov. Exh. 19G], for a total investment of $15,816. He also indicated that he received royalties from Barrett Oil for less than $300. The total investment of $15,816 less the $300 in royalties results in $15,516 of loss for Mr. Hill.

Michael Warren, and his wife Lisa, first invested $25,000 and then invested another $25,000 with Mr. Rodgers's companies. [R. 109 at 102.] Additionally, they paid five different requests for completion fees: one in the amount of $3,300 [R. 109 at 115] and four payments of $1,750 [R. 109 at 121–22]. Total, Mr. Warren invested $60,300. He also testified that they received up to $5,000 in money from royalties [R. 109 at 22] and that Rickey Rodgers refunded them $12,000 [R. 109 at 126]. By the Court's calculations, the $60,300 invested, minus the $5,000 in royalties and $12,000 in refund results in a loss of $43,300 for Mr. Warren and his wife.

Gary Whitehurst invested only once with Mr. Rodgers in the amount of $30,000. [R. 109 at 158.] Of this, he testified at trial that he received $1,700 in royalties. [R. 109 at 162–63.] Subtracting the amount of money he received from royalties, for the purpose of restitution, Mr. Whitehurst lost $28,300.

Similarly, Joanne Wojcik invested once in the amount of $7,500. [R. 112 at 64.] She testified that she received a check from Sunoco that was for an amount between $15 and $20. *Id.* at 67. Based on this information, the Court determines by a preponderance of the evidence that Ms. Wojcik lost $7,480.

## C

Some of the trial witnesses testified that they lost money but failed to specify how much. Bruce English paid Mr. Rodgers a total of $100,000 in four increments, as he also testified at trial.  [R. 108 at 10, 15–16.]  On cross, however, Mr. English was clear that he received checks, and believed they came from Barrett Oil, just not in the amounts he had anticipated.  *Id*. at 27–33.  Similarly, Matthew Tanner "guessed" that he had invested around $10,000.  [R. 71 at 11.]

Other trial witnesses could specify the amount of money they received but did not indicate whether they sustained losses.  Vincent DiSisto testified that he invested $25,000.  [R. 109 at 74; Gov. Exh. 8Q.]  While he received a bill for a completion fee of $3,500, he did not pay it.  [R. 109 at 89–90; Gov. Exh. 8G.]  Charles Hughes invested $12,500.  [R. 109 at 182.]  John Howard testified at trial that he invested $30,000 with Rick-Rod Oil in 2011.  [R. 112 at 76.]  However, he submitted a sworn statement to the Government that he invested $5,000 each in five wells, for a total of $25,000.  [R. 116-2.]  He also does not state whether or not he lost money on his investment, though his demands for a refund suggest that he did.  However, the testimony of these witnesses did not establish whether they received any of that investment, and if so, how much.  As stated previously, the testimony at trial suggested that many investors received at least some amount in royalties or other returns, though that amount varied wildly among investors.  [*See, e.g.*, R. 107 at 170, 221; R. 108 at 12, 31, 45, 59, 61, 93–94, 119, 127, 131, 182; R. 109 at 35–36, 118–119; R. 112 at 67.]

For these trial witnesses, the Court can find by a preponderance of the evidence that they lost money, however, the Court can only guess as to how much.  For this reason, the Court will deny these requests without prejudice and invite the Government to refile their requests and provide additional information.

**D**

Finally, the Government has submitted requests for several victims who have submitted victim impact statements concerning their investments. Some of these statements are sworn, while others are unsworn. The Court considers these requests, but because the victims were not subject to cross-examination at trial, specificity as to the amounts of investments and losses is required.

**1**

The Court received many requests in the form of a questionnaire or memorandum, whereby a victim alleged a certain amount of investment or loss, but that statement was not sworn and no other evidence was attached. Because of this lack of evidentiary support for the conclusory claims, as well as because the statements were not made under penalty of perjury, most of these statements are insufficient for the purposes of calculating restitution

Joan Antonelli completed an unsworn questionnaire and returned it to the Government. However, while she states that she invested with Mr. Rodgers, the questionnaire provides no specifics as to the amount of money she invested. The Government requests restitution in the amount of $88,230 but has provided no documentation or explanation of this amount. [R. 116-2 at 2.] Also, the Government requested restitution in the amount of $400,000 for Neil Chastain. [R. 116-1 at 1.] However, Mr. Chastain has not provided a statement, and the Government has provided no evidence other than a memorandum of an interview with Mr. Chastain to support this request. [R. 116-2.]

Robert Cohen also submitted an unsworn statement where he claims, "I believe I am due $10,000.00 in restitution." [R. 116-2.] He stated that he invested $10,000 and that he never received anything in return, but provided no affidavits, no evidence of checks, and no

explanation other than this conclusory statement. *Id.* David Paul Conley indicated he invested $15,000 in Rick-Rod. [R. 116-2.] He claims he only submitted one check for this investment, and he received no money in royalties or distributions. *Id.*

The Government submitted a request on behalf of Michael and Carol Darrow for restitution. In support of this, a statement was provided to the Court alleging an investment of $31,600. [R. 116-2.] However, this statement was not even signed, much less sworn to, and the Court is left only to assume that it was made by Mr. Darrow or Ms. Darrow simply because it was contained in the other papers relating to them. No one has provided evidence of this investment or submitted a sworn statement by either victim as to the amount of their loss.

Laurence and Janice Ellefson also provided unsworn statements, claiming a loss of $95,000. [R. 116-2.] They indicated in their questionnaire that they received $1,050 "+ or –" as a return for this investment. *Id.* However, they do not provide any evidence of their investment. In another statement, they claim that they invested $25,000 each in seven wells, plus paid a completion fee of $3,500 for each of those wells, but this totals an investment of $199,500 well over their claimed amount of $95,000. *Id.*

Likewise, Reem Jacob submitted an unsworn questionnaire where he asserts that he paid $11,833.00 to Rick-Rod Oil, and he stated he did not receive any royalties or other returns on this investment. [R. 116-2.] He provided some documentation to evidence his investment, but nothing to support a determination of the amount of his investment. *Id.* Michael Nichols also turned in a questionnaire, claiming he invested $375,000 and received nothing. *Id.* He also included tax returns for his company, Thistletop Energy, however, no specific evidence or documentation of his investment. *Id.*

Ray Overton returned an unsworn questionnaire but not an affidavit, claiming that he invested an initial $12,500, plus $1,666.50 and $1,650.00 in checks made out to Rick-Rod Oil for completion fees. [R. 116-2.] He also submitted copies of these checks. *Id*. He believes that he received up to $300 in returns but indicates he is unsure about the actual amount, and he includes no documentation to demonstrate the royalties he received. *Id*. The Government requests only $3,316.50 for Mr. Overton, but the Government does not explain how they arrived at this amount. [R. 116-1 at 6.]

Similarly, Kyle Pulliam provided a completed questionnaire stating that he invested $40,000 with Mr. Rodgers. [R. 116-2.] But this questionnaire was unsworn and did not include any additional documentation for these losses. *Id*. Furthermore, while Mr. Pulliam indicates he received "Maybe $300" in royalties or distributions, he lacks documentation and demonstrates uncertainty as to the precise amount. *Id*. T

Danny Reisinger also submitted a completed questionnaire, stating he invested $15,000 but providing no documentation to support this. [R. 116-2.] Also, in the questionnaire, he states that he had destroyed all paperwork relating to this matter. *Id*. He did not submit a sworn affidavit outlining his investment losses.

Richard and Linda Roberts completed the Government's questionnaire, claiming they invested $28,500. [R. 116-2.] They also provided check stubs showing their initial investment ($25,000) and their subsequent completion fee ($3,500). *Id*. However, as to the amount of money they received in royalties and distributions, their questionnaire directs the reader to see "Sheet E," but "Sheet E" is no where in the materials submitted to the Court. *Id*. The Government requests $27,500 in restitution for these victims, but does not explain how they arrived at that amount. [R. 116-1 at 7.]

In his questionnaire, Raymond Robinson claims he invested $30,000, but does not provide documentation for this amount. [R. 116-2.] He also indicates that he received royalties, but he did not answer the question as to how much. *Id*. Written as an answer to another question, he has written "$3,491.46," which the Court guesses could refer to the amount of royalties he received but cannot say for sure.

Rick and Cindy Saunders indicated in their questionnaire that they invested $200,000, but the Government did not provide any proof of this payment, only a contract stating their intention to pay. [R. 116-2.] Also, on their unsworn questionnaire, they claimed to have received royalty checks totaling $11,444.24. *Id*.

Blain Stout submitted an unsworn questionnaire as well, where he claims to have borrowed $30,000 against his house, but he does not indicate whether this $30,000 was for an investment with Mr. Rodgers. [R. 116-2.] Furthermore, he does not provide the Court with any information as to any payments he may have received for royalties or distributions.

Cathy and Robert Warren invested alongside Michael Warren. [R. 109 at 127.] At trial, Michael Warren testified that Robert and Cathy lost $76,000. *Id*. However, in their unsworn questionnaire, they claim to have only invested a total of $75,000. [R. 116-2.] Also, while they state they received royalties from Barrett Oil and Sunoco, they are "not totally sure on the amount." *Id*. The Government requests $66,000 for Robert and Cathy Warren but fail to inform the Court how they reached this number. [R. 116-1 at 8.]

Janet Windley also submitted an unsworn statement, where she claimed $90,000 in loss, but her statement lacked specificity as to the amount she invested and is completely devoid of additional evidence. [R. 116-2.]

For John Halloway, the Government submitted only an internal memorandum from an interview but did not submit any materials provided by the victim himself. [R. 116-2.] Also, for Larry Morse, the Government submitted only the internal memorandum of the interview, but no documents. *Id.* The Government requested $430,600 in restitution for Lucy Ni [R. 116-1 at 1] but provided only the memorandum notes of the interview [R. 116-2]. They also requested $30,000 in restitution for Aaron Steffen [R. 116-1 at 1], but again, they provided only notes of his interview [R. 116-2].

TSSN, LLC, is a slightly more complicated case. TSSN submitted only an unsworn questionnaire, no affidavit. [R. 116-2.] In that questionnaire, TSSN outlined investments of $25,000, $25,000, $3,500, $3,500, and $3,500, for a total of $60,500, and claimed they received royalties for $113.21, $58.60, $49.53, $47.12, $70.82, $53.56, $91.47, $64.94, $97.75, and $64.69, equaling $711.69. *Id.* However, TSSN only provides the Court with a copy of one check for $3,500. *Id.* Because this is an unsworn statement lacking sufficient evidence, even thought TSSN specified their loss amounts and investment amounts, the Court cannot determine by a preponderance of the evidence the amount of loss sustained by TSSN.

For some of these victims, the Government provided no records whatsoever to support their requests. The Government requested $30,000 on behalf of H&A Holding LLP [R. 116-1 at 9] but did not submit any documents whatsoever to support this request. Similarly, the Government alleged $150,000 in restitution for Leland Energy [R. 116-1 at 9] but with no supporting evidence attached.

The Court does not doubt that these victims suffered some loss in their investments. However, the information provided simply is not enough for the Court to determine any award of restitution. Thus, absent additional documentation, the Court denies the Government's requests

on behalf of Joan Antonelli, Neil Chastain, Robert Cohen, David Paul Conley, Laurence and Janice Ellefson, H&A Holding LLP, John Halloway, Reem and Victor Jacob, Leland Energy, Larry Morse, Lucy Ni, Michael Nichols, Aaron Steffen, Richard and Linda Roberts, Raymond Robinson, Rick and Cindy Saunders, Blain Stout, TSSN LLC, Cathy and Robert Warren, and Janet Windley.

## 2

Antonio Amedeo submitted an unsworn questionnaire to the Government, stating he invested $35,500.  [R. 116-2 (USA-00026377).]  He also submitted copies of checks written to Mr. Rodgers's various ventures in the amounts of $25,000 (USA-00026570), $3,500 (USA-00026568), $3,500 (USA-00026558), and $3,500 (USA-00026557), which total $35,500.  [R. 116-2.]  Because the checks support his statement, the Court finds that Mr. Amedeo invested $35,500.  Also, on that statement, Mr. Amedeo indicates that he received royalties totaling $660.10. [R. 116-2 (USA-00026377).]  The checks he provided, however, total a little more: $99.46 (USA-00026555) + $55.47 (USA-00026553) + $125.38 (USA-00026551) + $85.76 (USA-00026549) + $50.39 (USA-00026547) + $154.18 (USA-00026544) + $48.31 (USA-00026542) + $99.87 (USA-00026540) = $718.82.  The Court thus determines that he received $718.82 on his investment, resulting in a $34,781.18 loss.

Thomas Blanda returned a sworn affidavit, stating loss in the amount of $25,000.  [R. 116-2.]  However, he does not outline how he calculated this loss.  The United States provides documents indicating that Mr. Rodgers sent requests to Mr. Blanda for money but did not provide any evidence to show that Mr. Blanda actually paid these bills.  With merely a conclusory statement of loss and a lack of evidence to demonstrate how this statement was calculated, the Court cannot determine the amount of loss, if any, suffered by Mr. Blanda.

Kenneth and Barbara Brauer also submitted an affidavit to the Government, claiming $12,000 in loss. [R. 116-2.] The Government also provided checks written from the victims to Mr. Rodgers and his companies totaling $36,800. *Id*. While neither the victims nor the Government outline how they calculated a loss of $12,000, they have provided sufficient evidence for the Court to determine that they invested at least $36,800. Additionally, the testimony at trial supports an inference that the victims could have received up to $20,000 return on their investment from royalties and potentially payments from Rickey Rodgers. Thus, the Court finds by a preponderance of the evidence that Kenneth and Barbara Brauer lost $12,000 to this venture.

Sandra Bucaram signed an affidavit stating her losses to be $28,500. [R. 116-2.] She indicates that specific losses are outlined in an attachment, however, the Government has not provided an attachment. Nor has the Government provided any other evidence to demonstrate her losses. Having only this conclusory statement, the Court cannot determine Ms. Bucaram's amount of loss, if any.

Frank Caporusso submitted an unsworn questionnaire indicating that he suffered a loss. [R. 116-2.] He outlined amounts that he invested, but not the amounts that were returned to him. *Id*. Further, the checks provided to the Court as evidence were written to Sean Ryan, suggesting that these losses were shared between Mr. Caporusso and Mr. Ryan. *Id*. Mr. Ryan also produced an unsworn questionnaire, stating that he invested between $50,000 and $60,000 (same as Mr. Caporusso) and received back less than $1,000 (again, same as Mr. Caporusso). *Id*. The Government did provide evidence of a wire transfer from Mr. Ryan to Mr. Rodgers for $3,500, as well as a check from Barrett Oil to Mr. Ryan for $125.94. But none of this evidence is

sufficient for the Court to calculate losses for either Mr. Caporusso or Mr. Ryan by a preponderance of evidence.

Christopher Ray Curtis signed an affidavit, stating his losses totaled $28,500. [R. 116-2.] He had initially written "$35,500," but crossed that number out. But neither Mr. Curtis nor the Government provided additional evidence, or even explained how he arrived at a loss amount of $28,500. Absent this additional information, the Court cannot determine restitution by a preponderance of the evidence.

Paul Czaplicki also submitted an affidavit, where he requested $20,000 in restitution: $15,000 for his initial investment, plus $5,000 in interest. [R. 116-2.] He also provided his contract where he agreed to pay the $15,000. *Id*. Mr. Czaplicki also filled out a questionnaire where he indicated he had not received any royalty or distribution checks. *Id*. All of this together convinces the Court by a preponderance of the evidence that Mr. Czaplicki invested $15,000 but received nothing in return, making his total loss amount $15,000.

Kevin Denkevitz requested $31,600 in restitution, providing contracts from Rick-Rod Oil showing he invested $25,000, plus paid $6,666 in completion fees. [R. 116-2.] However, Mr. Denkevitz did not discuss whether he received any royalty or distributions resulting from that investment. Without knowing whether he collected any of his investment back, the Court cannot calculate his amount of loss.

The Government requested $15,500 on behalf of Russell and Donnabelle Ferrill. [R. 116-1 at 4.] However, the checks provided to the Court indicated that the victims paid $15,000 and $3,500 to Rick-Rod, while receiving $3,000 in royalties and a total of $25,000 from Rickey Rodgers. [R. 116-2.] This appears to actually have benefited the victims, and thus the Court finds they have not sustained any loss.

25

Robert Goldsmith and his company, Financial Fitness and Insurance Services, LLC, submitted an affidavit he lost $17,750 from his investment with Mr. Rodgers. [R. 116-2.] He also submitted checks coming from his account as well as the accounts of Financial Fitness in the amounts of $12,500, $1,750, $1,750, and $1,750, totaling $17,750. He also indicated that he received checks from Barrett Oil totaling $420.91. These provided statements and checks allow the Court to determine by a preponderance of the evidence that Mr. Goldsmith's loss totals $17,329.09.

Karen Shuss and Richard Hoots submitted an affidavit stating they invested $30,000 by paying Mr. Rodgers two personal checks. [R. 116-2.] They submitted the check stubs from those payments. *Id*. Additionally, they provided statements from Sunoco where they received royalties in the amounts of $1,223.70, $1,173.21, and $162.35, for a total of $2,559.26. *Id*. Subtracting these royalties from their initial investment, the Court finds that Ms. Shuss and Mr. Hoots are owed $27,440.74 in restitution.

Mark Douglas Hughes submitted an affidavit along with an unsworn questionnaire, whereby he claims to have invested $30,000 and received $4,000 of that in royalties or distribution checks. [R. 116-2.] Because this is more than a conclusory statement of his loss amount, the Court finds that Mr. Hughes has lost $26,000 for the purposes of restitution.

Steven Ives did not provide an affidavit, submitting only an unsworn questionnaire as a request for his losses. [R. 116-2.] However, he submitted checks demonstrating his investment of $30,000, less his royalties of $1,173.22, $1,223.70, and $162.36 from Sunoco, totaling $2,559.28. The Court finds this sufficient and determines his loss to be $27,440.72.

William Patrick Kennedy submitted a sworn affidavit stating losses in the amount of $858,325.75, calculating this based on expected return. [R. 116-2.] In this statement, he outlines

that he initially invested $25,000, plus a completion fee of $3,500, and he provided copies of these checks. *Id.* He also states that he received no royalties or distributions. *Id.* The affidavit and copies of checks are sufficient for the Court to determine that Mr. Kennedy invested $28,500 and received nothing back, making his actual loss $28,500 for purposes of restitution.

Eugene Kowalski signed an affidavit stating he lost $50,000 and attaching a copy of the check he provided to Mr. Rodgers for that $50,000 investment. [R. 116-2.] In his attached questionnaire, he claims to have invested as much as $128,000, but provides no documentation to support a finding that he invested more than $50,000. *Id.* He also states he only received around $100 back in royalties and distributions. Thus, the Court can determine by a preponderance of the evidence that Mr. Kowalski's losses totaled $49,900: the $50,000 investment less the $100 received in royalties.

Beverly Meyerhoff submitted an affidavit stating that she and her husband, James, borrowed $25,000 from his 401k. [R. 116-2.] They also allege losses of $3,171.21 in interest paid for the loan from his 401k. *Id.* However, this affidavit does not state how much, if any, of the $25,000 loan was invested with Mr. Rodgers, just that a loan was procured. *Id.* The Court can assume that this $25,000 was used as an investment, but absent further specificity or evidence, the Court cannot determine that Ms. Meyerhoff sustained this loss by a preponderance of the evidence.

William Moore completed an unsworn questionnaire, alleging he invested $53,750 and received $560 in royalties. [R. 116-2.] However, he only submitted copies of two checks from his account, each for $1,750 and totaling $3,500. *Id.* He also provided a copy of a royalty check from Barrett Oil in the amount of $560.61. *Id.* Given that his statement was unsworn, and he has only provided copies of checks totaling $3,500, the Court can only find sufficient evidence to

support an investment of $3,500. Less the $560.61 in royalties, the Court calculates Mr. Moore's losses to be $2,939.39.

Johnny Moy's affidavit stated losses of $25,000. [R. 116-2.] In the provided questionnaire, Mr. Moy elaborates on this, stating he invested $25,000 but received nothing in return. *Id*. The affidavit and questionnaire together demonstrate that Mr. Moy lost $25,000 in his investment with Mr. Rodgers.

Jim Noble submitted an affidavit claiming loss of $77,817.49. [R. 116-2.] He calculates this based on his original investment of $31,633, less royalties received from Barrett Oil in the amount of $506.01, resulting in a $31,126.99 loss. *Id*. He also claims restitution for loss of use of this money at a 15% interest rate for ten years, though this is not included for purposes of restitution. The $31,126.99 loss, however, is outlined with sufficient specificity for the Court to find restitution appropriate in that amount for Mr. Noble.

George Olivares requested $30,000 in restitution via an affidavit. [R. 116-2.] In his questionnaire, he indicates that this was one investment check and that he did not receive any money in return. *Id*. However, he qualifies this by saying he received nothing "from Rick-Rod Energy or R&R Plus." *Id*. Because he does not indicate whether or not he received royalties from anyone other than Mr. Rodgers's companies, specifically whether he received checks from Barrett Oil or Sunoco, the Court cannot determine precisely how much loss Mr. Olivares suffered.

Robert Ottaway outlined his investment in an affidavit. [R. 116-2.] He states that he invested $25,000 in one unit, paid $3,300 for a completion fee, paid another $3,333 for a completion fee, and then invested $12,000 for a new project, for a total of $43,633. *Id*. Additionally, he indicates he received payments amounting to $995.89. *Id*. He calculates his

loss as $42,637.11: his total investment of $43,633 minus his received payments of $995.89. *Id*. This is sufficiently specific amounts and calculations for the Court to determine that Mr. Ottaway lost $42,637.11.

David Parlons submitted an affidavit asking for $1,700,000 in restitution. [R. 116-2.] At trial, the Government introduced a "Confirmation of Facts" signed by Mr. Rodgers as evidence that David Parlons, through his company Kentucky Oil and Gas, Inc., had invested a total sum of $1,148,634.67. [Gov. Exh. 30G.] Mr. Parlons requests the $1,100,000 he invested with Mr. Rodgers, plus $600,000 in lost opportunities. [R. 116-2.] Other provided documents, specifically letters from his lawyers, state that Mr. Parlons only invested $1,003,634.67. *Id*. Mr. Parlons also never outlines whether he received any royalties from his investment. Absent specific information and calculations, the Court is unable to determine how much money Mr. Parlons actually lost. Because testimony at trial suggested that many investors received at least some amount in royalties or other returns, the Court finds it improbable to assume that Mr. Parlons received no royalties or distribution checks as a result from his investment exceeding a million dollars. [*See, e.g.*, R. 107 at 170, 221; R. 108 at 12, 31, 45, 59, 61, 93–94, 119, 127, 131, 182; R. 109 at 35–36, 118–119; R. 112 at 67.]

Kenneth Powell also submitted an affidavit, stating losses of $30,000. [R. 116-2.] The affidavit itself did not outline how Mr. Powell arrived at this conclusion. However, the accompanying questionnaire and contract with Rick-Rod Oil states that he invested $30,000. *Id*. Mr. Powell also indicates that he received checks for $2,559 and $5,157 in oil royalties. *Id*. This total return of $7,716 subtracted from Mr. Powell's investment indicates that he lost $22,284 for the purposes of restitution.

Mickey Powell submitted an affidavit, similarly stating losses of $30,000. [R. 116-2.] However, he did not include any documentation of this loss, evidence of his investment, or even an explanation of how he arrived at that calculation. *Id*. This conclusory statement of loss is insufficient for the Court to determine amount of restitution owed to Mr. Powell.

Scott and Sharon Scheuerman submitted an affidavit and a questionnaire. [R. 116-2.] Their affidavit claimed a loss of $60,500 and they submitted check stubs demonstrating payments of $25,000, $25,000, $3,500, $3,500 and $3,500. *Id*. Additionally, on their questionnaires, they state that they received a letter from Barrett Oil, but no royalty checks were ever sent to them. *Id*. From this, the Court determines Scott and Sharon Scheuerman lost $60,500 for the purposes of restitution.

David and Sewla Schultz also submitted an affidavit where they stated they invested $48,666.66. [R. 116-2.] They did not provide copies of the checks, but their sworn statement included specific amounts of individual payments, check numbers, and dates, all totaling $48,666.66. *Id*. They also provided check stubs from Barrett Oil in the amounts of $861.38, $576.92, $532.87, $770.01, $303.42, $1,388.42, $1,786.42, $768.13, $1,121.21, $143.43, $214.01, $190.45, $486.02, $98.39, $258.25, $291.34, $322.46, $180.06, $343.61, $194.76, $96.09, and $167.57 for a total of $11,095.22. *Id*. Additionally, they provided check stubs from Sunoco for $519.05, $151.74, $233.77, and $118.43 equaling $1,022.99. *Id*. Their total investment of $48,666.66, less the $11,095.22 in royalties from Barrett Oil and $1,022.99 in royalties from Sunoco, result in a total loss of $36,548.45 for David and Sewla Schultz.

David and Deborah submitted an affidavit and checks supporting a total investment of $16,000. [R. 116-2.] However, when asked about their returns and compensation, their affidavit states, "no compensation directly," suggesting they received at least some return on this

investment. *Id*. Because most investors received a least a small amount of royalties, and because they seem to indicate that they received at least some compensation from someone other than Mr. Rodgers, the Court is unable to determine their amount of loss by a preponderance of the evidence.

Finally, Lloyd Wilmers submitted an affidavit claiming he and his wife invested $55,000. [R. 116-2.] He also submitted check stubs for the amounts of $35,000, $10,000, and $10,000. *Id*. In that affidavit, he also states that he and his wife received royalty and distribution checks totaling $11,500. *Id*. Accordingly, subtracting the $11,500 from his total investment of $55,000, the Court determines that Mr. Wilmers lost a total of $43,500 for the purposes of restitution.

### III

The Government provided a spreadsheet containing restitution requests and hundreds of documents purportedly supporting these requests. The vast majority lacked specificity as to how much the victim actually lost by Mr. Rodgers's criminal conspiracy. In many cases, the Government simply provided evidence of investment, asking the Court to infer loss on behalf of the victim. However, a few of these requests did provide enough documentation for the Court to calculate loss for the purposes of restitution by a preponderance of the evidence. Accordingly, and the Court being sufficiently, advised, the Government's Motion for Restitution is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.     Mr. Rodgers **SHALL PAY** restitution to Candys Adams in the amount of $84,500.00;

2.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Antonio Amedeo in the amount of $34,781.18;

3.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Dale Beeghly in the amount of $18,780.00;

4.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Kenneth and Barbara Brauer in the amount of $12,000.00;

5.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Talbert "Hal" Campbell in the amount of $98,971.17;

6.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Stephen Chinnes in the amount of $29,537.33;

7.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Paul Czaplicki in the amount of $15,000.00;

8.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Jory Drager in the amount of $30,000.00;

9.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Avner Elizarov in the amount of $235,200.00;

10.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Pamela Freeman in the amount of $59,200.00;

11.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Robert Goldsmith in the amount of $17,329.09.00;

12.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Jack Hill in the amount of $15,516.00;

13.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Richard Hoots and Karen Shuss in the amount of $27,440.74;

14.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Mark Douglas Hughes in the amount of $26,000.00;

15.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Steven Ives in the amount of $27,440.72;

16.     Mr. Ronnie Rodgers **SHALL PAY** restitution to William Patrick and Diane Kennedy in the amount of $28,500.00;

17.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Eugene and Katherine Kowalski in the amount of $49,900.00;

18.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Andrew Linley in the amount of $650,000.00;

19.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Roy Lowery in the amount of $97,000.00;

20.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Eldridge Montgomery in the amount of $28,300.00;

21.     Mr. Ronnie Rodgers **SHALL PAY** restitution to William and Lisa Moore in the amount of $2,939.39;

22.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Johnny Moy in the amount of $25,000.00;

23.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Jim Noble in the amount of $31,126.99;

24.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Robert Ottaway in the amount of $42,637.11;

25.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Kennth Powell in the amount of $22,284.00;

26.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Randall Powell in the amount of $19,800.00;

27.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Scott and Sharon Scheuerman in the amount of $60,500.00;

28.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Patrick Schneider in the amount of $64,500.00;

29.     Mr. Ronnie Rodgers **SHALL PAY** restitution to David and Sewla Schultz in the amount of $36,548.45;

30.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Herb and Georgia Steffen in the amount of $30,000.00;

31.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Lillian Tharpe in the amount of $102,250.00;

32.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Michael and Lisa Warren in the amount of $43,300.00;

33.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Gary Whitehurst in the amount of $28,300.00;

34.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Lloyd Wilmers in the amount of $43,500.00;

35.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Joanne Wojcik in the amount of $7,480.00;

36.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Charles Zimmerman in the amount of $35,000.00;

37.     The requests for restitution on behalf of Joan Antonelli, Ed Bascum Grider, Jim Bedell, Ronnie Belk, Thomas Blanda, Paul Brooks, Junior Brown, Sandra Bucaram, Kimberly Cacciaguida, Frank Caporusso, Keooudom Chianthong, Cuppy's Coffee, Robert Cohen, David Paul Conley, Bobby Green and Barbara Curry, Christopher Ray Curtis, Michael Darby, Kevin Denkevitz, Sal and Elena DeRosa, Vincent DiSisto, Laurence and Janice Ellefson, Bruce English, Marvin Ezray, Russell and Donnabelle Ferrill, Global Moulding Inc., Gold Run Trading LLC, Mike Gould, Dennis Griffin, H&A Holding LLP, John and Laurel Halloway, Lance Harrison, Mike and Wanda Hatcher, Dianne Heleno, Suzanne Heleno, Murray Helmers, Larry Henderson, John Howard, Charles Hughes, David Hughes, Johnny and Carole Ireland, Reem and Victor Jacob, John Jarvis, Norman and Vicki Kent, Kevin Kessler, Richard Kittay, Leland Energy, Marketing Comm Inc., Edward and Mary McCaffrey, Rex McCarter, Edward Mendel, Nancy Mendel, Beverly and James Meyerhoff, Michael A. Minichino, Larry Morse, George Olivares, Ray Overton, Joan and William Naylor, Tom and Angela Newslow, Lucy Ni, Michael Nichols, Tony Norris, Kevin O'Connor, David Parlons, Ralph Pantony, Mickey Powell, Kyle Pulliam, Richard and Carol Quint, Ramsey Investment Group, Danny Reisinger, Roger and Melissa Richard, Michael and Robin Richardson, Richard and Linda Roberts, Raymond Robinson, Sean and Kimberly Ryan, Rick and Cindy Saunders, Bobby Simmons, David and Deborah Smith, Aaron Steffen, Blain Stout, Sammy and Margaret Taylor, Matthew Tanner, Texas Holsteins Inc., Timberwood Development Corp., TSSN LLC, Robert and Mildred Vaughn, Cathy and Robert Warren, Janet Windley, Condy and Betty Young, Connie and Mark Young, Troy Young, Richard Zimmerman are **DENIED**.  If the Government has additional,

specific information and evidence as to the amount of loss for these victims, the Government may refile these requests with the necessary documentation and specificity **on or before Monday, September 30, 2019**;

38.    The United States Probation Office is vested with the authority to organize payments of these restitution amounts, keeping in mind that payment should be made as soon as the Defendant is able; and

39.    Following the Court's resolution of any additional requests made by the Government, the Judgment in this case shall be amended to reflect this Court's findings regarding restitution.  If not additional requests are made, Judgment in this case shall be amended promptly after September 30, 2019.

This the 29th day of August, 2019.

Gregory F. Van Tatenhove
United States District Judge