UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 3:17-cr-0016-GFVT |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| RONNIE C. RODGERS, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

After the Court denied the Government's requests for restitution for several victims of
Defendant Ronnie C. Rodger's conspiracy to commit securities fraud, the United States has filed
supplemental information that allows the Court to calculate the accurate total loss for many of
these victims.  These requests include varying degrees of evidentiary support for the loss
amounts.  While the Court need not determine restitution by finding facts beyond a reasonable
doubt, the Court must determine a loss amount by a preponderance of the evidence.  Because
some of these requests are supported by sufficient evidence while others are not, the Court
**GRANTS IN PART** and **DENIES IN PART** the Government's Second Motion for Restitution.
Previously, the Court ordered Mr. Rodgers to pay restitution in the amount of $2,180,562.17.
However, after granting several more victims restitution, Mr. Rodgers is now ordered to pay
restitution in the combined amount of **$5,424,928.47**, as further outlined below.

**I**

**A**

Mr. Ronnie Rodgers was charged on December 7, 2017 with one count conspiracy to commit mail fraud, wire fraud, and securities fraud in violation of 18 U.S.C. §§ 1341 and 1343, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240-10b-5.  [R. 1.]  According to the indictment, from 2007 through 2017, Mr. Rodgers and his associates executed a scheme to sell oil and gas leases in geographical areas where Mr. Rodgers knew the leases would not produce enough oil or gas to provide a return on the investments.  *See id.*

The jury returned a guilty verdict for conspiracy to commit mail fraud, wire fraud, and securities fraud.  [R. 64.]  To convict Mr. Rodgers with mail or wire fraud, the jury was required to find the development of or participation in a scheme to defraud, that he used the mails or an interstate wire communication in furtherance of the scheme, and that he possessed "intent to deprive a victim of money or property."  *United States v. Ramer*, 883 F.3d 659, 681 (6th Cir. 2018) (enumerating the elements of mail fraud); *United States v. Olive*, 804 F.3d 747, 753 (6th Cir. 2015) (enumerating the elements of wire fraud and noting, "Mail fraud has essentially the same elements [as wire fraud] except that the use of the mails rather than a wire is required.").  For the jury to convict Mr. Rodgers of securities fraud, the jury had to find that he used or employed a manipulative or deceptive device in contravention of 17 C.F.R. § 240-10b-5 in connection with the purchase or sale of a security.  15 U.S.C. § 78j(b).  Accordingly, the jury had to determine that Mr. Rodgers (1) employed a device, scheme, or artifice to defraud, (2) made any untrue statement or omission of a material fact, or (3) engaged in an act, practice, or course of business, operating as a fraud or deceit.  17 C.F.R. § 240-10b-5.  However, Mr. Rodgers was charged with *conspiracy* to commit one of these things, and thus, the jury only need to find that

2

Mr. Rodgers joined in agreement to commit mail, wire, or securities fraud, and that at least one person in the conspiracy committed an overt act in support of the conspiracy. *United States v. Phillips*, 872 F.3d 803, 806 (6th Cir. 2017).

Mr. Rodgers was sentenced on January 9, 2019, to forty-eight months imprisonment, followed by three years of supervised release. [R. 88; R. 90.] Restitution was ordered, but a specific calculation of restitution was deferred pending briefing by both parties.[1] *Id.* The United States filed a motion for an award of restitution in the total amount of $6,874,766.01, on January 25, 2019, which included only a spreadsheet of the victims' alleged loss amounts and lacked any evidence to support those requests. [R. 97.] Mr. Rodgers made objections to a general award of restitution but made no specific objections to requests by each victim. [R. 101.] At a hearing held on February 20, 2019, the Court determined more evidence was needed to award restitution and directed further briefing. [R. 103; R. 104.] The United States filed their supplementation under seal [R. 116], and this Court granted in part and denied in part the government's First Motion for Restitution [R. 121.] The Court found that the vast majority of requests lacked specificity as to how much the victim actually lost. [*Id.*] Now, the United States has filed a Second Motion for Restitution in support of the victims ordered inaccurate, or denied, restitution pursuant to the Court's previous order. [R. 130.] Mr. Rodgers has not filed any objections.

---

[1] Under 18 U.S.C. §3664(d)(5), the Court must determine restitution within ninety days of sentencing the defendant. Mr. Rodgers's sentencing was held on January 9, 2019, and that ninety-day window has now passed. However, when a sentencing court misses the deadline, it does not forfeit power to order restitution if, prior to the deadline, the court made clear it would order restitution, but failed to specify an amount within ninety days. *Dolan v. United States*, 560 U.S. 605, 607–08 (2010). The Court stated at sentencing that restitution would be ordered pursuant to the Mandatory Victims Restitution Act but briefing on the specific amount of restitution was not completed until April 26, 2019. [R. 119.] Thus, under *Dolan*, the Court retains authority to set restitution for Mr. Rodgers.

**B**

Restitution in this case is mandatory.  The Mandatory Victims Restitution Act (MVRA) requires Courts to order restitution when sentencing defendants convicted of certain offenses.  18 U.S.C. § 3663A(a)(1).  Included in these offenses are crimes against property, including crimes involving fraud and deceit.  § 3663A(c)(1)(A)(ii).  When a defendant is convicted of a conspiracy, a Court may calculate restitution using "damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction."  *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016) (citations and quotations omitted).  Furthermore, if more than one defendant contributed to a victim's losses, the Court is permitted to make each defendant liable for the full amount of restitution or may choose to apportion restitution accordingly.  18 U.S.C. § 3664(h).  The Government bears the burden of proof to demonstrate the amount of loss sustained by a victim, and disputes must be resolved by the Court under a preponderance of the evidence standard.  § 3664(e).  In this specific matter, it is also important to note that restitution is calculated based on the full amount of a victim's losses, not Mr. Rodgers's gain.  § 3664(f)(1)(A).

A victim's losses must only be demonstrated by a preponderance of the evidence. §3664(e).  The "preponderance of the evidence" standard requires a trier of fact, in this case, the Court, to find "the existence of a fact is more probable than its nonexistence."  *Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371–72 (1970)).  Because the burden here rests on the Government, the Government must persuade the Court of the existence of their proposed facts.  *Id*.

Evidence "underlying an award must have sufficient indicia of reliability to support its probable accuracy." *United States v. Sawyer*, 825 F.3d 287, 294–95 (6th Cir. 2016) (citations and quotations omitted). The Court must make adequate factual findings when the calculated loss amount is disputed. *United States v. Sexton*, 894 F.3d 787, 801 (6th Cir. 2018). But the Circuit Courts generally leave evidentiary determinations, and which evidence provides an indicium of reliability, up to the District Courts, so long as the District Court explains its reasons.

If Mr. Rodgers had been indicted on specific counts of fraud, the jury would have had the opportunity to consider each victim's allegations and either accept or deny the evidence behind those allegations beyond a reasonable doubt. However, this does not mean that Mr. Rodgers cannot be held responsible for those losses. In *Apprendi v. New Jersey*, the Supreme Court found, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). However, because restitution statutes do not specify a statutory maximum amount, the Sixth Circuit has held that restitution claims need not be submitted to a jury. *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005). In this matter, restitution requests must demonstrate by a preponderance of the evidence, that the victim's losses result from conduct in furtherance of the convicted conspiracy, not just conduct from the over acts required for a conspiracy conviction. *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016).

Each request will require individual determinations of reliability, particularly when a defendant can provide evidence contrary to a victim's statement. Even without objections by a defendant, however, the victim's request must still include "sufficient indicia of reliability." *United States v. Sawyer*, 825 F.3d 287, 294–95 (6th Cir. 2016). Because the Sixth Circuit generally upholds a district court's restitution award so long as it is within "the universe of

acceptable computations," and because the Court "has wide latitude to determine the amount of a victim's losses," the Court takes this opportunity to outline what uncontested evidence would include such reliability sufficient to support an award of restitution. *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016); *United States v. Patel*, 711 F. App'x 283, 287 (6th Cir. 2017).

First, a victim's testimony at trial could support an award of restitution. Trial testimony occurs under penalty of perjury, and opposing counsel has the opportunity to cross examine the witness. The combination of direct questioning by the Government and cross examination by the defendant would give the Court sufficient information to determine whether or not a victim's statements are reliable. Evidence admitted at trial to accompany a victim's testimony is similarly subject to scrutiny by the defendant because this too gives the opportunity for a defendant to object to consideration of that evidence.

The more difficult question arises when a victim did not testify, was not subject to cross examination, but has submitted a statement to the Government, the USPO, or the Court requesting a specific award of restitution. While those statements may be sworn affidavits, the Court determines that statements by a victim, without additional documentation of loss amount, do not include sufficient indicia of reliability. *See, e.g., United States v. Steele*, 897 F.3d 606, 613 (4th Cir. 2018) (finding a victim's unsupported loss estimate, without additional evidence, insufficient to satisfy the Government's burden of proof); *United States v. Charles*, 895 F.3d 560, 566 (8th Cir. 2018) (finding mere statements, without other documentation, do not support a Government's claim by a preponderance of the evidence); *United States v. Baker*, 584 F. App'x 469, 471–72 (9th Cir. 2014) (finding the district court properly discredited evidence which did not clearly specify victim's losses or clearly specify how such losses were caused by the defendant's criminal conduct); *United States v. Simmons*, 544 F. App'x 21, 24 (2d Cir. 2013)

6

(finding the court abused its discretion by awarding restitution based on nothing more than an unsworn letter by a victim when the Government provided "almost no information about the loss amount, no documentation regarding [the victim's] loss, and no explanation as to why procuring details or documentation was impracticable").  *But see United States v. Dial*, 705 F. App'x 250, 255–56 (5th Cir. 2017) (finding the district court was permitted to rely solely on victim impact statements unless the defendant presented rebuttal evidence); *United States v. Lopez*, 503 F. App'x 147, 150 (3d Cir. 2012) (upholding an award of restitution based only on a Government-prepared spreadsheet of losses and a sworn statement by the victim).

While a conclusory statement by a victim suggests a loss, such statement does not provide sufficient evidence to determine the amount of loss or whether such loss was proximately caused by the victim.  Bank records, copies of checks, invoices, deposit slips, etc. all demonstrate a presumably reliable record of financial loss to which a defendant may make specific objections.  If the Government submits only a victim's statement of a total loss amount, a defendant would be forced to locate those same records in order to rebut the Government's request.  But determination of restitution is not a burden shifting framework and requiring this of the defendant improperly shifts the burden from the Government to demonstrate loss amount to the defendant to disprove loss amount.  A detailed sworn statement, however, outlining the total loss amount and how that loss amount was calculated, may be sufficient if the calculation is consistent with the testimony offered at trial.

Accordingly, the Court finds that mere conclusory statements, whether sworn or unsworn, are also insufficient to establish reliability sufficient to support an award of restitution. For this Court to find the required indicia of reliability, the Government must provide evidence other than a victim's stated loss amount to establish loss and the amount of that loss.  In this

case, copies of checks written to Mr. Rodgers and/or his affiliated companies, bank records showing transfers of money, invoices by Mr. Rodgers and/or his affiliated companies, and other related documents would indicate reliability to the Court.  Furthermore, the Court will consider detailed affidavits that include calculations of loss consistent with testimony offered at trial to be reliable.  The Court further notes that this list is not exclusive.

## II

Having outlined this framework, the Court now considers the restitution requests by the Government.

## A

In the United States' First Motion for Restitution, the Government made numerous requests based on checks obtained from the Department of Financial Institutions, but which did not include a statement, sworn or unsworn, from the victim.  [*See* R. 116.]  These requests were insufficient to determine an amount of loss for restitution purposes: while the Court could clearly see that the alleged victim paid Mr. Rodgers and/or Rick-Rod Oil, the Court was unable to determine if this was the actual amount of loss.  Testimony at trial suggested that many investors received at least some amount in royalties or other returns, though that amount varied wildly among investors.  [*See, e.g.*, R. 107 at 170, 221; R. 108 at 12, 31, 45, 59, 61, 93–94, 119, 127, 131, 182; R. 109 at 35–36, 118–119; R. 112 at 67.]  Thus, absent any evidence that these victims received any of this money back, the Court was left to guess the amount of loss by these victims.  This exercise does not meet a preponderance of evidence threshold.  For these victims, the United States failed to meet its burden.  18 U.S.C. § 3664(e).  The United States has now provided additional documentation on behalf of some of the individuals that were denied restitution based on lack of information.

Again, the United States has resubmitted some of the same requests based only on checks obtained from the Department of Financial Institutions.  As noted, the United States has been unable to communicate with many of these victims and therefore does not provide any statement from the victims as to how their loss should be calculated.  [R. 130 at 23.]  While the checks give the Court clear indication as to how much the victim invested initially, the Court is unable to accurately calculate the total amount of loss without more information as to whether the victims received royalty, distribution, or any other payments from their investment.  Having determined this, absent additional documentation, the restitution requests on behalf of Louis and Judith Arruda, Ronnie Belk, Lance Harrison, Murray Helmers, Larry Henderson, Johnny and Carole Ireland, John Jarvis, Tony Norris, Michael and Robin Richardson, and Sandra Bucaram are **DENIED**.

In addition to copies of checks provided, Gregory Barber stated in a sworn statement that he invested $25,000 with Ronnie Rodgers.  [R. 130-2.]  Mr. Barber subsequently made three $3,500 completion fee payments, only one of which Mr. Barber has in his possession.  [*Id*. at 1.]  Mr. Barber also indicates through his sworn statement that he received royalty payments of nominal amounts of up to but not more than $300.  [*Id*.]  Without evidence to the contrary, the Court concludes that Mr. Barber has provided sufficient information to calculate his loss as $35,200.

Similarly, Jim Bedell has submitted a sworn statement along with copies of checks that confirms that Mr. Bedell invested a total of $32,000.  [R. 130-3.]  He initially invested $25,000 with Ronnie Rodgers and Clinton-Pulaski Prospect #14, LTD and subsequently paid two completion fees, totaling $7,000.  [*Id*.]  Mr. Bedell also admits that he did not receive any

royalties, distributions, or any other payments as a result of his investment. [*Id*. at 1.] Thus, the Court calculates Mr. Bedell's loss to be his total investment, which is $32,000.

Kimberly Ryan also states through a sworn statement that she invested with Mr. Rodgers. [R. 130-39 at 1.] Specifically, the United States has previously submitted evidence of both the executed agreement and check showing that Ms. Ryan invested $7,500 with Ronnie Rodgers and the Metcalfe County Project. [*Id*. at 2-9.] Furthermore, Ms. Ryan clearly states that she did not make any other investments or receive any royalty payments or distributions from her investment. [*Id*. at 1.] The Court finds that without evidence to the contrary, Ms. Ryan's loss is $7,500.

Next, David Hughes states through a sworn statement that he invested with Ronnie Rodgers into a well project in Metcalfe County. [R. 130-16 at 1.] Specifically, the Government produced two checks from Mr. Hughes for $15,000 each for a total investment of $30,000. [*Id*. at 3-5.] Additionally, he states that he received two to three small royalty payments for a total of no more than $500. [*Id*. at 1.] Since the Defendant has not objected or produced evidence to the contrary, the Court finds Mr. Hughes' loss to be $29,500.

Norman Kent invested $152,000 with Rick Rod Oil Company into five different packages, which he specifies. [R. 130-18.] Mr. Kent recently submitted a sworn statement that details his investment total of $152,000. [*Id*.] He also states that he received small royalty checks from Barrett Oil and Sunoco, which totaled to no more than $4,600. [*Id*.] The Court finds that the additional documentation introduced by the United States supports that Mr. Kent invested $152,000, and he received up to $4,600 back in royalty payments, making his total loss for the purposes of restitution to be $147,400.

Another victim, Nancy Mendel, states through her sworn statement that she invested a total of $69,000 and has provided the Court copies of each of the nine investment checks. [R. 130-19 at 1, 67-75.] Ms. Mendel further states that she did not receive any royalties, distributions, or any other payments as a result of this investment. [*Id*. at 1.] Thus, the Court finds Ms. Mendel lost $69,000 for the purpose of restitution.

Michael Minichino was denied restitution in the previous order because of a lack of specificity regarding his investment. In addition to the checks the Government produced, they also provided an unsigned and unsworn letter from Mr. Minichino. [R. 116-2.] However, that letter made only a reference to $25,000 without specifying how much he invested or indicating whether or not he received any return on that investment. [*Id*.] In order to clarify, Mr. Minichino has submitted a sworn statement that explains that in September 2009, he invested a total of $28,500 with Ronnie Rodgers into Clinton Pulaski Prospect #13 LTD via two checks. [R. 130-21.] Mr. Minichino also states that he did not receive any royalties, distributions, or any other payments as a result of this investment. [*Id*.] By the Court's calculations, this means Mr. Minichino lost a total of $28,500 for the purpose of restitution.

Again the Court previously denied restitution to Kevin O'Connor and Ralph Pantony due to the lack of documentation and specificity as to how to calculate each of their losses. Both individuals entered into 50-50 partnership with each other when they invested with Rick Rod Oil Company and Ronnie Rodgers. [R. 130-27.] Through a sworn statement, both victims detail that they invested $25,000 into Adair Clinton #6 with a $3,300 completion fee and $25,000 into Adair Clinton #7 with a $3,500 completion fee. [*Id*.] This makes their combined total investment to be $56,800. [*Id*.] Mr. O'Connor has provided the Court with all the payments he received as part of his investment, which total $6,558.95. [*Id*.] While. Mr. Pantony is not able to

provide copies and information of the payments he received, his returns should be a mirror image of Mr. O'Connor's given their investments were equal.  [*Id.*]  Subtracting the $13,117.90 in royalty payments from their total investment of $56,800 results in a combined loss of $43,682.10.  Thus, Mr. O'Connor and Mr. Pantony have each suffered a loss of $21,841.05.

Samuel Ramsey, the President of Ramsey Investment Group, provided the check for $10,000 he invested with Mr. Rodgers.  [R. 130-29.]  He states that he received one royalty check for $3,000, but is unable to provide documentation of such check because his financial institution does not maintain records this long.  [*Id.*]  However, his sworn statement and copy of his investment check combine to corroborate his amount of loss.  [*Id.*]  After subtracting the $3,000 from the total investment of $10,000, the Court finds Mr. Ramsey's loss to be $7,000.

Mike Gould, who is the principal and sole member of Coyote de la Sierra and Gold Run Trading LLC, states that he invested in Mr. Rodger's scheme.  [R. 130-38.]  Specifically, he indicates that he invested $25,000 with Rick Rod Oil and Ronnie Rodgers into Clinton Pulaski Prospect #14, LTD.  [*Id.*]  He also invested $35,500 with Rick Rod Oil into Clinton Pulaski Prospect #15, LTD.  [*Id.*]  Mr. Gould also paid one $3,500 completion fee.  [*Id.*]  Mr. Gould is unable to provide copies of these investment checks, but he has provided the check numbers of each of the three checks.  [*Id.*]  Mr. Gould also states that remembers getting five payments from Sunoco Inc. in the range of $50 and $80 dollars per check.  [*Id.*]  Therefore, Mr. Gould could have received no more than $500 in royalty payments.  [*Id.*]  Without evidence to the contrary, the Court concludes that the documentation Mr. Gould has provided proves by a preponderance of the evidence that Mr. Gould lost $63,500 in this venture.

Dianne and Suzanne Heleno claim that they invested $210,000 with Rick Rod Oil and Ronnie Rodgers.  [R. 130-51.]  Diane and Suzanne had an agreement that each invest 50% of the

initial fees and 50% of the completions fees.  [*Id*.]  Their initial investments totaled $175,000,

which were split between five different packages at $25,000 each ($12,500 individually).  [*Id*.]

The sisters then paid $35,000 in completion fees which correspond with the letters they received.

[*Id*.]  The Helenos provided the Court with copies of checks, carbon copies of checks, wire

receipts, and division contracts in support of their investment.  [*Id*.]  Further, the Helenos state in

their sworn statement that they received no more than $2,500 in royalty payments, but are only

able to provide some documentation of these receipts.  [*Id*.]  The total investment of $210,000

less the $2,500 in royalties results in $207,500 of loss for Dianne and Suzanne Heleno, which is

divided into $103,750 each.

Paul Brooks, on behalf of Yellow Dog Adventures, invested $25,000 with Ronnie

Rodgers and Clinton Pulaski Propsect #14 LTD, which is confirmed by a copy of the check the

United States provided.  [R. 130-40.]  In regard to royalty payments that Mr. Brooks received,

the United States has submitted memorandum notes from their interview with Mr. Brooks.  [*Id*.]

During his interview, he admitted he received $1,000 in royalty payments.  [*Id*.]  Due to the lack

of contradicting evidence or objections by the Defendant, the Court finds that Paul Brooks and

Yellow Dog Adventures suffered a loss of $24,000 for the purpose of restitution.

**B**

Some of the trial witnesses testified at trial that they lost money but failed to specify how

much, so the Court was previously unable to calculate the amount of loss without additional

documentation.  Bruce English paid Mr. Rodgers a total of $100,000 in four increments, as he

testified at trial.  [R. 108 at 10, 15–16.]  On cross, however, Mr. English was clear that he

received checks, and believed they came from Barrett Oil, just not in the amounts he had

anticipated.  [*Id*. at 27–33.]  Mr. English has now provided the Court with additional

13

documentation and requests restitution in the amount of $101,586.92.  [R. 130-13 at 1.]  Mr.

English provides in a sworn statement that he invested a total of $105,475 into three different

well packages.  [*Id*.]  Mr. English also states that he received royalty payments of $1,388.08

"which were received sporadically in small amounts and a single $2,500 payment."  [*Id*.]

However, the Adair Circuit Court judgment Mr. English obtained against Rick Rod Oil Co., Inc.

indicates a lower net loss amount.  [*Id*. at 16.]  Mr. English explained that the $6,000 credit

indicated in the judgment was an estimation at the time the complaint was filed.  [R. 130 at 8.]

The Court finds that Mr. English's loss is $98,086.92, which mirrors the circuit court judgment,

which subtracted $7,388.08 in credits.

Other trial witnesses could specify the amount of money they received but did not

indicate whether they sustained losses.  Vincent DiSisto testified that he invested $25,000 and

has now submitted a copy of the cashiers check portraying such amount.  [R. 109 at 74; Gov.

Exh. 8Q; R. 130-11 at 2.]  While he received a bill for a completion fee of $3,500, he did not pay

it.  [R. 109 at 89–90; Gov. Exh. 8G.]  Mr. DiSisto has provided a sworn statement that affirms he

did not pay any completion fees and he has not received any royalty payments, distributions, or

any other money back from his investment.  [R. 130-11 at 1.]  Therefore, the Court finds Mr.

DiSisto's loss to be $25,000, the amount of his investment.

Charles Hughes invested $12,500 plus half of a normal completion of $1,750.  [R. 130-15

at 1.]  Mr. Howard also states that he did not receive any royalties or any other payments from

his investment.  [*Id*.]  Therefore, the Court finds that Mr. Hughes' loss is $14,250, the total

amount of his investment and completion fee.

 John Howard testified at trial that he invested $30,000 with Rick-Rod Oil in 2011.  [R.

112 at 76.]  However, he submitted a sworn statement to the Government that he invested $5,000

each in five wells, for a total of $25,000.  [R. 116-2.]  He also did not state whether or not he lost money on his investment, though his demands for a refund suggest that he did.  Now, the United States has affirmed that the declaration of loss indicated by Mr. Howard as $25,000 was incorrect.  [R. 130 at 9.]  The United States has provided support that clearly shows Mr. Howard invested $30,000.  [R. 130-14.]   Mr. Howard also indicates that he did not receive any royalty or distribution payments but he did receive $100 in cash from Defendant upon confronting him about the lack of a return on his investment.  By the Court's calculations, the $30,000 invested, minus the $100 in cash results in a loss of $29,900 for Mr. Howard.

C

Finally, the Government submitted requests for several victims who had submitted victim impact statements concerning their investments.  Some of these statements were sworn, while others were unsworn.  The Court considered these requests, but because the victims were not subject to cross-examination at trial, specificity as to the amounts of investments and losses is required.  The United States has now provided additional statements and varying evidentiary support for some of the victims the Court was unable to calculate total amount of loss due to lack of specificity.

1

The Court received many requests in the form of a questionnaire or memorandum, whereby a victim alleged a certain amount of investment or loss, but that statement was not sworn and no other evidence was attached.  Because of the lack of evidentiary support for the conclusory claims, as well as because the statements were not made under penalty of perjury, most of these statements were insufficient for the purposes of calculating restitution.

This Court denied restitution to Joan Antonelli because she submitted an unsworn questionnaire and returned it to the Government.  [R. 121 at 18.]  Ms. Antonelli has now submitted additional supporting documentation including a sworn statement, executed agreements with Rick Rod Oil Co., and correspondence containing Defendant's signature. [R. 130-1.]  This documentation provides that Antonelli invested $90,000 and received royalties in the amount of $3,263.40.  [*Id.*]  Therefore, the Court calculates the loss of Joan Antonelli to be $86,736.60.

Robert Cohen also submitted an unsworn statement where he claimed, "I believe I am due $10,000.00 in restitution"  [R. 116-2] but provided no affidavits, no evidence of checks, and no explanation other than this conclusory statement.  [*Id.*]  Now, Mr. Cohen has submitted a sworn statement that provides that between 2005 and 2008, he invested $10,000 with Ronnie Rodgers and received no royalty payments.  [R. 130-7 at 1.]  Therefore, this Court finds that Mr. Cohen's loss is $10,000, the amount of his investment.

David Paul Conley indicated in his unsworn statement that he invested $15,000 in Rick-Rod.  [R. 116-2.]  Now, Mr. Conley has provided the Court a sworn statement that affirms his investment of $15,000 with Ronnie Rodgers in 2004.  [R. 130-8.]  He states he only submitted one check for this investment, and he received no money in royalties or distributions.  [*Id.*]  Therefore, the Court finds that Mr. Conley's loss is $15,000.

The Government submitted a request on behalf of Michael and Carol Darrow for restitution.  In support of this, a statement was provided to the Court alleging an investment of $31,600.  [R. 116-2.]  However, this statement was not signed, much less sworn to.  Mr. Darrow has now submitted a sworn statement indicating that he invested $31,600 in Adair-Clinton Prospect #5, LTD which includes the initial $25,000 investment and $6,600 in two completion

fees.  [R. 130-9 at 1.]  Mr. Darrow has also provided executed copies of the Subscription

Agreements, letters for the completion fees, division contracts with Sunoco and Barret Oil

Purchasing, and copies of royalty checks proving his ownership interest and investor status.  [*Id*.

at 22-25.]  Thus, the Court subtracts the $908.63 in royalties from the total investment of

$31,600, for a total loss of $30,691.37.

Laurence and Janice Ellefson also provided unsworn statements, claiming a loss of

$95,000.  [R. 116-2.]  The statements provided by the victims did not clearly reference their

investments and did not include any other evidence.  Now, the Ellefsons have submitted copies

of each of the ten investment checks which combined total $99,500.  [R. 130-12 at 27-32.]  The

Ellefsons also provide that they received royalties in the total amount of $791.26.  [*Id*. at 33-35.]

Subtracting $791.26 in royalties from the total investment of $99,500 results in a loss of

$98,708.74 for Mr. and Ms. Ellefson.

Likewise, Victor and Reem Jacob submitted an unsworn questionnaire where he asserted

that he paid $11,833.00 to Rick-Rod Oil, and he stated he did not receive any royalties or other

returns on this investment.  [R. 116-2.]  They provided some documentation to evidence his

investment, but nothing to support a determination of the amount of his investment.  [*Id*.]  The

Jacobs have now provided copies of checks which show that they invested a total of $10,667.33

with Ronnie Rodgers.  [R. 130-17 at 3-5.]  The Jacobs also provide through a sworn statement

that they did not receive any royalties, distributions or any other payments.  [*Id*. at 1.]  Thus,

Victor and Reem Jacob's loss is the amount of their investment, $10,667.33.

Michael Nichols, also turned in a questionnaire, claiming he invested $375,000 and

received nothing.  [R. 116-2.]  He also included tax returns for his company, Thistletop Energy,

however, no specific evidence or documentation of his investment.  [*Id*.]  Now, Mr. Nichols

states that he invested $475,000 via a wire in 2014 to Barry Gilley, Ronnie Rodgers' attorney,

for the purchase of specific wells.  [R. 130-23.]  The United States has provided evidence of this

transaction, which was filed with Metcalfe County Clerk's office through assignment agreements

signed by R.C. Rodgers and Barry Gilley.  [*Id.* at 11-12, 15-17.]  Those assignments explicitly

reference that they received $475,000 from Thistletop Energy LLC in consideration for Ronnie

Rodgers' rights and interest to certain wells.  [*Id.*]  Mr. Nichols also received various royalties

and returns on his investment ending December 21, 2017, for a total of $94,349.76.  [*Id.*]  Thus,

the Court calculates Thistletop Energy LLC's loss to be $380,650.24.

Ray Overton returned an unsworn questionnaire but not an affidavit, claiming that he

invested an initial $12,500, plus $1,666.50 and $1,650.00 in checks made out to Rick-Rod Oil

for completion fees.  [R. 116-2.]  He also submitted copies of these checks.  [*Id.*]  However, Mr.

Overton was unsure about the actual amount of royalties that he received.  [*Id.*]  Mr. Overton has

now specified through a sworn statement that he remembers receiving no more than $300 in

royalty payments from his investment.  [R. 130-26.]  While the Defendant has not provided any

evidence to the contrary, the Court finds that Mr. Overton suffered a loss of $15,516.50.

Similarly, Kyle Pulliam provided a completed questionnaire stating that he invested

$40,000 with Mr. Rodgers.  [R. 116-2.]  But this questionnaire was unsworn and did not include

any additional documentation for these losses.  [*Id.*]  Furthermore, while Mr. Pulliam indicated

he received "Maybe $300" in royalties or distributions, he lacked documentation and

demonstrated uncertainty as to the precise amount.  [*Id.*]  Mr. Pulliam recently submitted

supporting documentation that includes a sworn statement and statements from his mutual fund

institution.  [R. 130-28.]  This confirms that Mr. Pulliam invested $40,000 with Ronnie Rodgers

by dissipating assets he had obtained within his mutual fund.  [*Id.*]  Again, Mr. Pulliam admits

that he received five or six royalty payments of nominally small amounts over the course of a few months that totaled no more than $300.  [*Id.*]  Based on this information, the Court determines by a preponderance of the evidence that Mr. Pulliam lost $39,700.

Danny Reisinger also submitted a completed questionnaire, stating he invested $15,000 but provided no documentation to support this.  [R. 116-2.]  Even though Mr. Reisinger no longer possesses all the paperwork relating to this matter, he has submitted a sworn statement, along with a personal ledger he maintained through this investment.  [R. 130-30.]  Mr. Reisinger received royalty payments in the total amount of $201.51.  [*Id.*]  By the Court's calculations, this means Mr. Reisinger lost a total of $14,798.49 for the purpose of restitution.

Richard and Linda Roberts completed the Government's questionnaire, claiming they invested $28,500.  [R. 116-2.]  They also provided check stubs showing their initial investment ($25,000) and their subsequent completion fee ($3,500).  [*Id.*]  However, as to the amount of money they received in royalties and distributions, their questionnaire directs the reader to see "Sheet E," but "Sheet E" was no where in the materials submitted to the Court.  [*Id.*]  Now, Mr. Roberts indicates he does not have a copy of the second/final completion fee of $3,500 he paid because his financial institution does not maintain records that bar back.  [R. 130-31 at 1.] However, he has submitted a sworn statement and ledger that details that Mr. Roberts received a total of $1,184.90 in total gross royalties and paid two completion fees to Mr. Rodgers totaling, $7,000.  [*Id.* at 109.]  Subtracting the $1,184.90 he received from his total investment of $32,000, Mr. Roberts' loss for the purpose of restitution is $30,815.10.

In his questionnaire, Raymond Robinson claimed he invested $30,000, but did not provide documentation for this amount.  [R. 116-2.]  There was also a lack of clarity regarding royalties he received.  [*Id.*]  Mr. Robinson has now made clear through a sworn statement that he

invested $30,000 and received royalties in the total amount of $3,491.46. [R. 130-32 at 1.] The total investment of $30,000 less the $3,491.46 in royalties results in $26,508.04 of loss for Mr. Robinson.

Blain Stout submitted an unsworn questionnaire as well, where he claimed to have borrowed $30,000 against his house, but he did not indicate whether this $30,000 was for an investment with Mr. Rodgers. [R. 116-2.] He also did not provide the Court with any information as to any payments he may have received for royalties or distributions. Mr. Stout has provided the Court with proof of his investment including a sworn statement, division contracts that show his status as an investor, and copies of some checks. [R. 130-35.] Mr. Stout has provided the date, check number and amount of each of the royalty checks he received totaling, $506.22. [*Id*. at 1-2.] Thus, the Court calculates Mr. Stout's loss to be $29,493.78.

Cathy and Robert Warren invested alongside Michael Warren. [R. 109 at 127.] At trial, Michael Warren testified that Robert and Cathy lost $76,000. [*Id*.] However, in their unsworn questionnaire, they claimed to have only invested a total of $75,000. [R. 116-2.] In a sworn statement, the Warrens recently submitted, they indicate that they invested approximately $75,000 into Rick Road Oil Company, but given the length of time that has passed, they only are able to provide proof for a total investment of $55,000. [R. 30-36 at 1.] The Warrens also received royalty payments in the total amount of $11,837.74. [*Id*.] Therefore, the Court finds that Mr. and Ms. Warren's loss is $43,162.26: the $55,000 of their investment less the royalty payments they received from Mr. Rodgers.

Janet Windley also submitted an unsworn statement, where she claimed $90,000 in loss, but her statement lacked specificity as to the amount she invested and was completely devoid of additional evidence. [R. 116-2.] Ms. Windley has now provided sufficient support of her

investment through a sworn statement, a copy of her investment account, and her signed contracts with Mr. Rodgers. [R. 130-37.] This evidence shows that Ms. Windley invested $90,000 with Mr. Rodgers and received royalty payments in the total amount of $3,567.382. [*Id.*] Thus, the Court calculates the loss of Janet Windley to be $86,432.18.

Also, for Larry Morse, the Government initially submitted only the internal memorandum of the interview, but no documents. [R. 116-2.] As the Government has now discovered, Mr. Morse has passed away. However, Mr. Morse's spouse, Cathy Morse has submitted a sworn statement that corroborates the amount of Mr. Morse's investment of $35,000 into Rick Rod Oil. [R. 130-22.] The Court finds that Ms. Morse's statement, along with the internal memorandum of the interview of Mr. Morse is sufficient to find that Mr. Morse suffered a total loss of $35,000.

The Government also requested $30,000 in restitution for Aaron Steffen [R. 116-1 at 1], but again, they provided only notes of his interview [R. 116-2]. Mr. Steffen has now provided copies of the two checks that show he invested $30,000 with Rick Rod Oil Company and Ronnie Rodgers. [R. 130-34 at 10.] Also, through a sworn statement, Mr. Steffen indicates that he did not receive any royalties from his investment. [*Id.* at 1.] The Court finds his loss to be $30,000.

**2**

Thomas Blanda returned a sworn affidavit, stating loss in the amount of $25,000. [R. 116-2.] However, he did not outline how he calculated this loss. The United States provided documents indicating that Mr. Rodgers sent requests to Mr. Blanda for money but did not provide any evidence to show that Mr. Blanda actually paid these bills. Now, Mr. Blanda states that he is unable to provide the Court copies of checks of his investment, but has provided a questionnaire, sworn statement, and contracts with Mr. Rodgers that show his status as an investor. [R. 130-5.] Also, Mr. Blanda has provided support that he received royalty payments

21

totaling $891.22.  [*Id.* at 1.]  Subtracting the royalty payments from his total investment of $25,000, the Court finds Mr. Blanda lost $24,108.78 for the purpose of restitution.

Kenneth and Barbara Brauer also submitted an affidavit to the Government, claiming $12,000 in loss.  [R. 116-2.]  The Government also provided checks written from the victims to Mr. Rodgers and his companies totaling $36,800.  [*Id.*]  The Court also found that the testimony at trial supported an inference that the victims could have received up to $20,000 return on their investment from royalties and potentially payments from Rickey Rodgers and calculated the Brauer's loss to be $12,000.  After collecting additional information, the Government now provides that Mr. and Ms. Brauer invested $40,800 with Ronnie Rodgers through four separate checks provided.  [R. 130-4.]  They have also provided that the Brauers received a total of $8,009.84 in royalty payments from Barret Oil and Sunoco.  [*Id.*]  Therefore, this Court amends their prior judgment to Mr. and Ms. Brauer's loss to be $32,790.16.

Frank Caporusso submitted an unsworn questionnaire indicating that he suffered a loss. [R. 116-2.]  He initially outlined amounts that he invested, but not the amounts that were returned to him.  [*Id.*]  Further, the checks provided to the Court as evidence were written to Sean Ryan.  [*Id.*]  Mr. Caporusso and Mr. Ryan have now clarified that they entered into an informal 50-50 relationship investing with Rick Rod Oil Company and Ronnie Rodgers.  [R. 130-6 at 1.]  As such, each would be responsible for 50% of the costs of the investment and if paid 100% to Ronnie Rodgers, the other would reimburse the first for his 50% share.  [*Id.*]  Their sworn statement also indicates there were other projects the victims individually invested into without the other.  [*Id.*]  Therefore, supporting information provides that Mr. Ryan's total investment was $45,250 and he received a total of $507.90 in royalty payments.  [*Id.* at 3, 92-96.]  Thus, the Court calculates Mr. Ryan's total loss to be 44,742.10.  Supporting

22

documentation shows that Mr. Caporusso's total investment was $60,250 and he received a total of $1,452.42 in royalty payments.  [*Id*. at 2, 87-91.]  Therefore, Mr. Caporusso suffered a loss of $58,797.58.

Kevin Denkevitz initially requested $31,600 in restitution, providing contracts from Rick-Rod Oil showing he invested $25,000, plus he paid $6,666 in completion fees.  [R. 116-2.] However, Mr. Denkevitz did not discuss whether he received any royalty or distributions resulting from that investment.  Mr. Denkevitz has now provided a sworn statement with supporting documents including copies of the investment checks supporting a $31,600 investment.  [R. 130-10.]  He also has provided a copy of the only royalty check he received which amounts to $45.70.  [*Id*.]  Subtracting his royalty payment from his total investment, the Court finds that Mr. Denkevitz's loss is $31, 554.30.

Beverly Meyerhoff submitted an affidavit stating that she and her husband, James, borrowed $25,000 from his 401k.  [R. 116-2.]  They also alleged losses of $3,171.21 in interest paid for the loan from his 401k.  [*Id*.]  However, this affidavit did not state how much, if any, of the $25,000 loan was invested with Mr. Rodgers, just that a loan was procured.  [*Id*.]  Ms. Meyerhoff has now submitted another sworn statement specifying her investment with Ronnie Rodgers, along with copies of the relevant checks.  [R. 13-20.]  The supporting information provides evidence that Ms. Meyerhoff invested $25,00 with Ronnie Rodgers into Adair-Clinton Prospect #8, LTD and received $694.29 in royalty payments.  [*Id*.]  Thus, the Court calculates Ms. Meyerhoff's total loss to be $24,305.74 after such royalties are subtracted.

George Olivares is the sole member and director of Go Underground LLC.  [R. 130-25 at 1.]  On behalf of the company, he requested $30,000 in restitution via an affidavit.  [R. 116-2.] Because he did not indicate whether or not he received royalties from anyone other than Mr.

Rodgers's companies, specifically whether he received checks from Barrett Oil or Sunoco, the Court could not determine precisely how much loss Mr. Olivares suffered.  Recent supporting documentation provided by Mr. Olivares confirms that his company invested $30,000 with Ronnie Rodgers and he received royalties from Barret Oil and Sunoco totaling $466.68.  [R. 130-25.]  Subtracting the amount of royalties he received from his total investment, the Court finds that Mr. Olivares on behalf of Go Underground LLC suffered a loss of $29,533.32.

David Parlons previously submitted an affidavit asking for $1,700,000 in restitution.  [R. 116-2.]  At trial, the Government introduced a "Confirmation of Facts" signed by Mr. Rodgers as evidence that David Parlons, through his company Kentucky Oil and Gas, Inc., had invested a total sum of $1,148,634.67.  [Gov. Exh. 30G.]  Mr. Parlons requested the $1,100,000 he invested with Mr. Rodgers, plus $600,000 in lost opportunities.  [R. 116-2.]  Other provided documents, specifically letters from his lawyers, state that Mr. Parlons only invested $1,003,634.67.  [*Id.*]  Mr. Parlons also never outlined whether he received any royalties from his investment.  Mr. Parlons has recently submitted a sworn statement detailing his investment with Ronnie Rodgers.  [R. 130-27 at 1.]  He explains that "Kentucky Oil and Gas did not enter into lease agreements with the Rodgers.  Rather Kentucky Oil and Gas purchased the leases and hired Rodgers as our contact in Kentucky to manage our drilling activities."  [*Id.*]  Therefore, Mr. Parlons' company did not receive royalties from their investment.  [*Id.*]  The Court finds that based on the given information and supporting evidence, Mr. Parlons on behalf of Kentucky Oil and Gas, Inc. suffered a loss of $1,148,634.67.

David and Deborah Smith previously submitted an affidavit and checks supporting a total investment of $16,000.  [R. 116-2.]  However, when asked about their returns and compensation, their affidavit stated, "no compensation directly," suggesting they received at least some return

24

on this investment.  [*Id.*]  Through a sworn statement, Mr. Smith has now clarified that he did not receive any royalty checks or any other payments of any type related to his investment with Mr. Rodgers.  [R. 130-33 at 1.]  Thus, for the purpose of restitution, Mr. and Ms. Smith sustained a loss of $16,000.

### D

In August 2019, this Court denied restitution to almost 100 victims. The vast majority lacked specificity as to how much the victim actually lost by Mr. Rodgers's criminal conspiracy. In many cases, the Government simply provided evidence of investment, asking the Court to infer loss on behalf of the victim.  Since that time, the United States "has taken the time to not only contact as many victims as possible but also review the additional supporting documentation for those victims who had submitted such documentation."  [R. 130 at 30.]  Thus, the United States has requested leave to make any supplemental filings up to an including 90 days after the judgment is rendered.  [*Id.*]  The United States indicates they need additional time to contact victims that are still lacking documentation, which they were not able to contact prior to the filing this Motion.  [*Id.*]

The Court understands the significant amount of time the United States must put forth in order to work with each victim and provide supporting documentation.  However, a significant amount of time has passed since the United States filed their Second Motion for Restitution on December 15, 2019.  As this time has passed, the Court assumes that the Government has been working diligently in order to fulfill any supplemental filings needed for the remaining victims that have been denied restitution due to lack of documentation.  Therefore, the Court will grant the United States leave to make any supplemental filings up to and including 30 days after this judgment is entered.

25

**III**

Accordingly, and the Court being sufficiently, advised, the Government's Motion for Restitution **[R. 130]** is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Mr. Rodgers **SHALL PAY** restitution to Gregory Barber in the amount of $35,200.00;

2.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Jim Bedell in the amount of $32,000.00;

3.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Kimberly Ryan in the amount of $7,500.00;

4.      Mr. Ronnie Rodgers **SHALL PAY** restitution to David Hughes in the amount of $29,500.00;

5.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Norman Kent in the amount of $147,400.00;

6.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Nancy Mendel in the amount of $69,000.00;

7.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Michael Minichino in the amount of $28,500.00;

8.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Kevin O'Connor in the amount of $21,841.05;

9.      Mr. Ronnie Rodgers **SHALL PAY** restitution to Ralph Pantony in the amount of $21,841.05;

10.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Samuel Ramsey (Ramsey Investment Group) in the amount of $7,000.00;

11.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Mike Gould (Coyote de la Sierra and Gold Run Trading LLC) in the amount of $63,500.00;

12.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Diane Heleno in the amount of $103,750.00;

13.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Suzanne Heleno in the amount of $103,750.00;

14.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Paul Brooks (Yellow Dog Adventures) in the amount of $24,000.00;

15.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Bruch English in the amount of $98,086.92;

16.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Vincent DiSisto in the amount of $25,000.00;

17.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Charles Hughes in the amount of $14,250.00;

18.     Mr. Ronnie Rodgers **SHALL PAY** restitution to John Howard in the amount of $29,900.00;

19.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Joan Antonelli in the amount of $86,736.60;

20.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Robert Cohen in the amount of $10,000.00;

21.     Mr. Ronnie Rodgers **SHALL PAY** restitution to David Paul Croley in the amount of $15,000.00;

22.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Michael and Carol Darrow in the amount of $30,691.37;

23.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Laurence and Janice Ellefson in the amount of $98,708.74;

24.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Victor and Reem Jacob in the amount of $10,667.33;

25.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Michael Nichols (Thistletop Energy LLC) in the amount of $380,650.24;

26.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Ray Overton in the amount of $15,516.50;

27.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Kyle Pulliam in the amount of $39,700.00;

28.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Danny Reisinger in the amount of $14,798.49;

29.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Richard and Linda Roberts in the amount of $30,815.10;

30.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Raymond Robinson in the amount of $26,508.04;

31.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Blain Stout in the amount of $29,493.78;

32.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Cathy and Robert Warren in the amount of $43,162.26;

33.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Janet Winley in the amount of $86,432.18;

34.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Cathy Morse on behalf of Larry Morse in the amount of $35,000.00;

35.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Aaron Steffen in the amount of $30,000.00;

36.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Thomas Blanda in the amount of $24,108.78;

37.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Kenneth and Barbara Brauer in the amount of $32,790.16.  The Clerk shall **AMEND** the previous restitution order [R. 121] to reflect this amount;

38.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Frank Caporusso in the amount of $58,797.58;

39.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Sean Ryan in the amount of $44,742.10;

40.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Kevin Denkevitz in the amount of $31,554.30;

41.     Mr. Ronnie Rodgers **SHALL PAY** restitution to Beverly Meyerhoff in the amount of $24,305.74;

42.     Mr. Ronnie Rodgers **SHALL PAY** restitution to George Olivares (Go Underground LLC) in the amount of $29,533.32;

43.     Mr. Ronnie Rodgers **SHALL PAY** restitution to David Parlons (Kentucky Oil and Gas, Inc.) in the amount of $1,148,634.67;

44.     Mr. Ronnie Rodgers **SHALL PAY** restitution to David and Deborah Smith in the amount of $16,000.00;

45.     The requests for restitution on behalf of Louis and Judith Arruda, Ronnie Belk, Lance Harrison, Murray Helmers, Larry Henderson, Johnny and Carole Ireland, John Jarvis, Tony Norris, Michael and Robin Richardson, and Sandra Bucaram are **DENIED**.  If the Government has additional evidence as to the amount of loss for these victims, the Government may refile these requests with the necessary documentation and specificity **up to and including 30 days** after this Judgment is entered.

46.     The Government was unable to provide supporting documentation for Michael Darby and Darby Homes, Bobby Simmons, Dennis Griffin, Mike and Wanda Hatcher, Edward and Mary McCaffrey, Rex McCarter, Edward Mendel, Joan and William Naylor, Tom and Angela Newslow, Roger and Melissa Richard, Sammy and Margaret Taylor, Texas Holsteins, Inc., Timberwood Development Corp., Robert and Mildred Vaughn, Condy and Betty Young, Connie and Mark Young, Troy Young, Neil Chastain, John Halloway, H&A Holding LLP, Leland Energy, Christopher Ray Curtis, Mickey Powell, Ibrahim and Dima Ayoub, and Rick and Cindy Saunders and requests leave to contact such victims.  If the Government has additional, specific information and evidence as to the amount of loss for these victims, the Government may refile these requests with the necessary documentation and specificity **up to and including 30 days** after this Judgment is entered;

30

47.     The United States Probation Office is vested with the authority to organize payments of these restitution amounts, keeping in mind that payment should be made as soon as the Defendant is able; and

48.     Following the Court's resolution of any additional requests made by the Government, the Judgment in this case shall be amended to reflect this Court's findings regarding restitution.  If no additional requests are made, Judgment in this case shall be amended promptly after 30 days from this Judgment.

This the 10th day of June, 2020.

Gregory F. Van Tatenhove
United States District Judge